In re the MARRIAGE OF Harriet S. PITLUCK, Petitioner-Appellant,

and

Steven L. Pitluck, Respondent-Respondent.

No. WD 31639.

Missouri Court of Appeals, Western District.

May 4, 1981.

Irving Achtenberg, Kansas City, for petitioner-appellant.

W. H. Utz, Jr., St. Joseph, for respondent-respondent.

Before KENNEDY, P. J., and SHANGLER and SOMERVILLE, JJ.

KENNEDY, Presiding Judge.

The 18-year marriage of Harriet and Steven Pitluck was dissolved by decree of the Circuit Court of Buchanan County on January 16, 1980. Harriet has appealed, complaining of the court's setting aside certain property as Steven's non-marital property; that a $10,890 cash hoard in Steven's possession was found by the court to be the property of Steven's grandmother, and complaining also of the court's division of marital property, of the inadequacy of child support and maintenance awards, and of the inadequacy of attorney's and accountant's fee awards.

1. *Stevens Hat Manufacturing Company stock.*

■ The court determined that 325 shares of Stevens Hat Manufacturing Company common stock, valued at $243,750, was Steven's non-marital property. The stock had been transferred to Steven by his father, Louis Pitluck, as gifts over a period of years. Louis's gift tax returns showed 91 shares given in 1966; 100 shares in 1969; 10 shares in 1972; 15 shares in 1973; 50 shares in 1974; 15 shares in 1975; 20 shares in 1976; 11 shares in 1977; and 11 shares in 1978. The Stevens Hat Manufacturing Company, by whom Steven was employed as a vice-president, was described as a closely-held family corporation. Steven's shares represented a 10 percent interest. Louis's gift tax returns show 252 shares given to Steven's brother Jon over the same period as the transfers to Steven. The trial court correctly found that they were Steven's non-marital property as "property acquired by gift", § 452.330.2[1], RSMo 1978, and set them over to Steven.

2. *Life insurance policies.*

The court awarded to Steven as non-marital property life insurance policies, upon Steven's life, having a cash surrender value of $12,799. There were 23 of such policies, which had been taken out at ages 13 through 40 years. Nineteen of them were dated before 1976, and on those nineteen policies Steven's father, Louis, had paid the premiums through the year 1975. Four of the policies were taken out in 1976 and later. Steven took over the payment of the premiums on all the policies in 1976 and at trial time the total annual premiums exceeded $3,000.

■ Harriet is not necessarily wrong when she argues that the cash value added by premiums paid from family funds beginning in 1976 was marital property. *Hilger v. Hilger*, 570 S.W.2d 736, 740 (Mo.App. 1978). But the trial court was entirely without evidence as to how much cash value, if any, was added to the policies by the premiums paid by Steven in 1976 and afterwards, and the trial court could not deal in guesswork. Rule 73.01. *Cf. Seiner v. Seiner*, 552 S.W.2d 54, 56[4] (Mo.App.1977). The cash value attributable to premiums paid by Louis before 1976 could be treated as gifts from Louis to Steven and thus Steven's non-marital separate property, § 452.330.-2[1], *supra*. The trial court did not err in

setting these over to Steven as non-marital separate property.

### 3. *Cash hoard in deposit box.*

█ A cash hoard of $10,890 was discovered in a safety deposit box leased by Steven in his own name. Steven testified that the money belonged to his mentally incompetent grandmother, and represented the proceeds of a certain Federal Home Loan Bank bond of hers which he had cashed. The evidence on this point was conflicting, but it was for the trial court to resolve conflicts in evidence. *Prudential Property & Casualty Ins. Co. v. Cole*, 586 S.W.2d 433 (Mo.App.1979); *In re Marriage of Baker*, 584 S.W.2d 449 (Mo.App.1979). There was substantial evidence to support the trial court's finding that the money was the property of Steven's grandmother, and the court did not err in omitting it from his decree and not distributing it to either party.

### 4. *Division of marital property.*

Harriet claims she should have had a greater share of the marital property, and contends that the trial court did not give proper weight to the factors listed in § 452.330.1, RSMo 1978. We believe the court did give consideration to all the statutory factors and that the court's division of the property was amply supported by the evidence.

█ The marital property was found to include the following. We will list it with the values assigned to it by the trial court, and the party to whom it was set over:

#### TO HARRIET (72%)

| | | |
|---|---|---|
| Residence ($83,000 value net of $20,000 mortgage) | $63,000.00 | |
| Silverware and residence furnishings | 15,000.00 | |
| Certificates of deposit, savings and checking accounts and U.S. "E" bonds | 34,931.28 | |
| 1977 Ford Thunderbird | 3,500.00 | |
| | | $116,431.28 |

#### TO STEVEN (28%)

| | | |
|---|---|---|
| Furniture | $ 2,000.00 | |
| Pension Fund | 1,551.21 | |
| Checking accounts | 1,525.00 | |
| Commodities trading account | 2,570.00 | |
| Corporation stocks | 37,199.00 | |
| | | $ 44,845.21 |
| Total marital property | | 161,276.49 |

The trial court in his memorandum accompanying his decree specifically took note of $57,837 received by Harriet from a family partnership over the years of the parties' marriage, which went into the marital pool, and the trial court increased her share of the marital property by that amount. While the court in his decision makes no specific finding or mention of Steven's admitted marital misconduct, still the property division is sufficiently weighted to reflect such misconduct, as well as the other statutory factors listed in § 452.330.1, *supra*. Leaving aside the $57,837, Harriet's share of the remainder is 57 percent, Steven's 43 percent.

### 5. *Child support and maintenance.*

The court awarded to Harriet $450 per month for the support of the two teen-age Pitluck daughters, Lori and Linda ($225 each), whose primary custody was awarded to Harriet. The estimated expenses for their groceries, clothing, school expenses and supplies, miscellaneous personal expenses and spending money, totaled $480. This estimate submitted by Harriet was not challenged, but it did not include their share of household expenses—such as housing and utilities—and includes nothing for transportation, medical expense and insurance.

The court awarded Harriet maintenance of $350 per month.

Harriet listed monthly needs of $1,060.75, but omitted any amount for insurance—medical, home owners, and automobile, estimated in the evidence at $1,500 to $1,700 per year—and omitted any amount for mortgage payments on the residence ($153.36 per month), and omitted any amount for maintenance of the residence.

█ We believe that the evidence calls for a greater allowance for maintenance for Harriet.

Harriet was at trial time 38 years of age. She had not been employed at any time during the marriage, except for about six months in a clerical capacity at Stevens Hat Manufacturing Company, during her and

Steven's marriage crisis. There was no evidence at all about her employability. She had two years' college. She testified to some health problems, perhaps resulting from the emotional stress of the marriage breakup. The family's life style was that of rather privileged status, with domestic help, country club and racquet club memberships, luxury automobiles and a good deal of leisure.

Harriet's income-producing property is valued at $54,427.46, including separate property of $19,496.18 and marital property share of $34,931.28. This will be reduced by at least $7,473.57 attorney's and accountant's fees through the trial and not including the present appeal. The evidence does not inform us how much income might be expected from the deposit certificates and U. S. bonds, which represent approximately 75 percent of the income-producing property. If we assume an annual return of 10 percent, the income will be offset by a correspondent loss of principal by inflation. *Beaulieu v. Elliott*, 434 P.2d 665, 671 (Alaska 1967); *Mendelsohn v. Anderson*, 26 Wash.App. 933, 614 P.2d 693, 697 [9, 10] (1980).

Steven on the other hand had salary and bonus for 1978 of $35,262. In addition he was furnished an automobile with all operating expenses paid. He received marital and non-marital assets valued at $335,767.71, of which $86,941.72 is income producing. The Stevens Hat Manufacturing Company stock, valued at $243,750, has paid no dividends but apparently has steadily increased in value. Its book value in 1969 was $361.10 per share, according to Louis's gift tax return for that year, and in 1978 its book value was $1,180 per share. (The market value of Steven's stock was agreed to be $750 per share.)

Steven itemized and estimated his own living expenses at $1,290 per month.

Harriet's maintenance should be increased from $350 per month to $650 per month. *Farnsworth v. Farnsworth*, 553 S.W.2d 485 (Mo.App.1977); *In Re Marriage of Morris*, 588 S.W.2d 39, 45 (Mo.App.1979).

The court awarded to Harriet one-half her attorney's fees of $11,047.15, or $5,523.57, and one-half the $3,900 cost of an accountant's services to evaluate the Stevens Hat stock, or $1,950. The court has a wide discretion in the award of attorney fees and litigation expenses and we find no abuse of discretion here. *Viers v. Viers*, 600 S.W.2d 214 (Mo.App.1980).

Harriet's maintenance is increased from $350 per month to $650 per month. In all other respects the judgment is affirmed. The case is remanded to the trial court for entry of a new decree. The increased maintenance amount is effective as of the date of the trial court's January 16, 1980, judgment, of course. *In Re Marriage of Morris, supra.*

All concur.