**In re the MARRIAGE of Betty J. MORRIS, Petitioner/Appellant,**

**and**

**Harry A. Morris, Respondent.**

**No. KCD 29936.**

Missouri Court of Appeals, Western District.

July 31, 1979.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 1, 1979.

Application to Transfer Denied Nov. 14, 1979.

As Modified on Court's Own Motion Sept. 4, 1979.

Robert C. Paden, Michael W. Manners, Paden, Welch, Martin, Albano & Graeff, P. C., Independence, for petitioner/appellant.

Lee M. Nation, Michael E. Curley, Nation & Curley, Kansas City, for respondent.

Before DIXON, P. J., and TURNAGE and KENNEDY, JJ.

TURNAGE, Judge.

Betty Morris filed for a dissolution of her marriage with Harry A. Morris. The court ordered the marriage dissolved, divided the marital property, made an award of maintenance to Betty and denied her attorney fees. Betty appeals.

On this appeal Betty contends the court erred in the division of marital property, in its valuation of Harry's stock in a professional corporation, in finding that part of such stock was non-marital property, in the amount awarded for maintenance and in failing to award her attorney fees. Judgment affirmed as modified.

Betty and Harry were married in April, 1953. She was a high school graduate and until six months prior to the marriage had worked as a clerk typist. Harry, whose first wife was deceased, was an attorney in Kansas City who began practicing in 1935. No children were born of this marriage. However, Harry's eight year old daughter from his first marriage was adopted and reared by Betty.

Subsequent to the marriage, Harry's practice began to flourish and the parties moved from an apartment to a house they built in South Kansas City. Betty never worked. She did entertain Harry's clients and business associates, but late in the marriage began to experience some reluctance to continue this activity. The parties acquired a condominium in Florida and spent some time there later in the marriage.

Betty liked living in Florida and requested Harry to retire or partially retire so they could spend more time in Florida and traveling, but Harry felt he was unable to do so. The parties separated in May, 1976, when she departed for the Florida home.

Harry practiced with a partnership until 1971 when it was converted to a professional corporation; Harry, with 2500 shares, was the largest stockholder. His earnings from 1972 through 1976 ranged from $97,000 to $126,000 annually and for 1977 were projected at $114,000.

Betty brought no property to the marriage and, of course, all of her living expenses were supplied by Harry. Prior to her departure, Betty withdrew more than $600 from a joint checking account, overdrew another account by $700, incurred credit card charges of about $3,000, sold a Cadillac purchased by Harry for about $1,000 and sold a mink jacket given to her by Harry for an undetermined amount. Harry paid all of the overdrafts and the charges incurred.

After extensive hearings, the trial court divided the marital property as follows: To Betty he awarded the Florida condominium and all of its furnishings, with an agreed value of $100,000, subject to a mortgage of $34,191 which Betty was ordered to pay; a Pinto automobile with an agreed value of $1,350; a savings account with a $3,000 balance; membership in the Delray Dunes Country Club in Florida with a transfer value of $5,000. To Harry he awarded the family home in Kansas City with an agreed value of $128,500, subject to a mortgage of $38,000 which Harry was ordered to pay; Torotel common stock with an agreed value of $2,218; stock in First Fidelity Investment Trust with an agreed value of $6,678; ownership of all of his insurance policies with a cash value of $17,500 subject to an indebtedness of $14,550; membership in Blue Hills Golf Club with no transfer value; and 1100 shares of stock in the professional corporation found to be marital property and valued by the court at $13,750. The total value of the above property awarded to the wife was $75,150, and that awarded

to Harry was $116,096. In addition, the court awarded Betty lump sum maintenance in the sum of $10,000 with half payable in 1977 and half in 1978, and ordered Harry to designate Betty as the sole beneficiary on two insurance policies, subject to their indebtedness. The court awarded Betty maintenance of $1,500 per month and denied her request that her attorney fees of about $4,000 be paid by Harry.

Betty first contends the court abused its discretion in awarding Harry the greater portion of the marital property because she was not guilty of any misconduct, she did not receive more non-marital property than Harry, and her economic circumstances were not superior to Harry. Betty not only contends the court erred in the division it made of the marital property, but contends she should have been awarded a greater share of that property because of the disparity between the economic circumstances of the parties. The major premise of Betty's argument is that in dividing marital property the norm is an equal division and before a court can vary therefrom it must be shown that such variance is required by a consideration of the factors enumerated in § 452.330.1, RSMo 1978.[1] However, Betty's premise is faulty, as was pointed out in *In Re Marriage of B. K. S.*, 535 S.W.2d 534, 536[4] (Mo.App.1976) when this court held § 452.330 does not require an equal division of property but rather requires a *just* division after the court considers all relevant factors including those listed in that section. Thus, Betty's argument that the court was required to make an equal division unless a consideration of the factors mentioned dictated a contrary result is erroneous. The court was required to make a *just* division of the marital property.

Betty further contends the court should have awarded a majority of the marital property to her. A review of the division of marital property under *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976) fails to convince this court that the division is against the weight of the evidence and

there is no firm belief that the judgment in that respect is wrong. On the values found by the court, the disparity is not great and as will be pointed out later, although the valuation made of Harry's stock in the professional corporation was wrong, the division made by the court is not against the weight of the evidence. The parties stipulated Betty was to receive the Florida condominium and Harry was to receive the residence in Kansas City. These two items make up the bulk of the property to be divided. The court was unable to award Betty any of the professional corporation stock because of restrictions placed on it by agreement. This left only the Torotel and First Fidelity stock available for disposition. There was also stock in the KCI Bank, but the parties stipulated this stock had no net value because it was subject to an indebtedness which equalled its value. Thus, the only property the court could have awarded Betty which it did not was the Torotel and First Fidelity stock. The value of these two stocks is not sufficient to make the division of property against the weight of the evidence.

Betty further contends the court should have found some value in benefits enjoyed by Harry for the use of private club facilities and for meals provided at corporation expense for him in a private dining room in the law office. The meals received by Harry had a value of about $650 per year and the private club memberships of which Betty principally complains were actually owned by the corporation, with Harry simply designated as the person authorized to use them. He testified the clubs were used primarily for the entertainment of clients. Betty has not demonstrated any error on the part of the court in failing to ascribe a monetary value to these benefits which should have been taken into consideration in a division of the marital property. In any event, the value would be no more than nominal.

Betty contends the court erred in its determination of the value of 1100 shares in

---

1. All statutory references are to RSMo 1978 unless otherwise specified.

the professional corporation found to be marital property. The parties stipulated the stock had a book value of $15.95 per share. A stock redemption agreement was introduced in evidence by which each shareholder agreed that he would not encumber or dispose of any stock except to the corporation. The corporation agreed to purchase all of the stock of a shareholder upon his death, permanent disability, disqualification to practice law, retirement from active practice at any time after age 65, or his termination of employment by the corporation. The agreement contained a valuation formula for each of the above contingencies on which the corporation would purchase the stock. The agreement provided that on the death or permanent disablement of a stockholder the corporation would pay two times the book value for each share. Upon the shareholder becoming disqualified to practice, the value per share would be its book value plus or minus an amount equal to the per share appreciation or depreciation of fair market value as compared to the cost of any investments or intangibles owned by the corporation. In the event of a shareholder's retirement after age 65, the purchase price would be negotiated between the shareholder and the corporation. Upon the termination of employment of a shareholder, the value of his stock would be determined by a schedule by which the corporation would pay a fixed percentage of the amount paid for the shares or the book value, whichever was less. The percentage of purchase price increased with the length of time the shares had been owned from July 1, 1974. The applicable percentage for Harry's stock at the time of trial was in the 2-3 year category (the number of years lapsed from July 1, 1974) and provided the corporation would pay 117% of the amount paid for his shares or the book value, whichever was less. The court chose to value Harry's marital shares on this basis and since 117% of the purchase price was less than the book value, it assigned a value of $13,750 to the 1100 shares found to be marital. The agreement further contained a definition of book value as being the capital and surplus of the corporation as reflected on its financial records plus the face amount of all accounts receivable not previously charged off as uncollectable, less a discount and reserve for uncollectable or doubtful accounts in the amount of 50% of the accounts receivable, less the notes and accounts payable and all other liabilities of the corporation. The total so computed is, of course divided by the number of outstanding shares. The agreement provided that no value was to be attributed to any good will of the corporation or any unbilled work in process. Insurance policies on the lives of the shareholders were to be valued at their cash surrender value.

The parties meet here in dispute as to which of the valuation methods contained in the agreement the court should have used in valuing the 1100 marital shares. Betty strongly contends the court should have used the method provided for the death of a shareholder, while Harry contends the court used the method which most closely resembled the situation before the court in view of the fact that Harry was neither dead, disqualified to practice nor retired.

The parties led the trial court into error when they successfully argued the court was restricted to one of the valuation methods contained in the redemption agreement. While valuation questions will generally involve market value, the question to be resolved here is the true or actual value of Harry's marital stock. *Stern v. Stern*, 66 N.J. 340, 331 A.2d 257, 261 (1975). The court in *Stern*, considering the valuation of a law partner's capital account, stated the most useful method for that case was found by looking to the partnership agreement which provided a method of valuation in case of death of the partner. However, the court pointed out the objective was to determine the true value of the partner's interest. Here, the objective was to determine the true value of Harry's marital shares, and in arriving at this determination the court was not restricted to various valuation methods provided in the redemption agreement when obviously none of the methods contemplated the situation before

the court. Clearly, the valuation method in case of the death of a stockholder would not be appropriate because it provided a premium value for the stocks rather than the true value.

The question of the true value in a professional corporation is difficult because there is no market for such shares and, therefore, market value is not appropriate. However, it would seem the factors mentioned in Annotation Divorce—Value of Interest in Partnership, 74 A.L.R.3d 621, 623 (1976) would be appropriate to consider in corporation stock valuation along with any other relevant factors. The annotation states assets such as capital investments, capital accounts, other fixed shares of partnership worth, accrued equity, accounts receivable, as adjusted, the value of work in progress, appreciation of tangible personalty, goodwill, cash on hand and partnership life insurance should be considered in determining the value of a partner's interest. It will be noted many of the factors listed in the annotation are contained in the definition of book value in the redemption agreement. However, the court was not restricted to consideration of only the factors listed in the redemption agreement when it arrived at the true value of Harry's stock. The court was free to receive any relevant evidence on this subject. However, the parties did not introduce any evidence other than the purchase price and the stipulated book value. In that case the court should have taken the book value of Harry's stock as its true value because it utilized most of the relevant factors which would reveal true value. The court erred in valuing the 1100 shares of marital stock at 117% of purchase price, for a total of $13,750, but rather should have valued the stock at book value of $15.95 a share for a total value of $17,545. However, the small increase in value of the marital stock does not alter the order dividing the marital property and the division made by the court will not be disturbed because of this change in valuation.

◼ Betty next contends the court erroneously found that 1400 of Harry's shares in the professional corporation were non-marital property. When the corporation was formed, 2500 shares were issued to Harry at a price of $10 per share. Harry stated he paid for these shares by transferring to the corporation his law library with an agreed value of $6,000, his office furniture with an agreed value of $8,000, both acquired prior to the marriage, and $11,000 in cash. The court found that $14,000 of the purchase price for his shares was nonmarital property because it constituted property belonging to Harry prior to the marriage, but that $11,000, representing 1100 shares, was marital property. Betty contends an additional 600 shares should have been considered marital property because the law library could not have been acquired prior to 1953 and still have been up-to-date as Harry testified it was in 1971.

◼ The clear inference from Harry's testimony was that his basic law library was acquired prior to his marriage in 1953 but that after marriage additions to it were charged off as partnership expenses. The library acquired its status as separate property of Harry because it was acquired and title vested prior to marriage. Betty apparently argues marital funds were expended to maintain and update it, but there was no evidence to show this. However, even assuming the use of marital funds does not convert the library to marital property because separate property does not become marital property only by expending marital funds to maintain or improve it. *Stark v. Stark*, 539 S.W.2d 779, 783[5] (Mo.App. 1976).

◼ Betty next strongly contends the maintenance award of $1,500 per month is inadequate. The court awarded Betty $10,000 in lump sum maintenance, with $5,000 to be paid in 1977 and $5,000 in 1978. This should probably be considered as rehabilitative maintenance because Betty was not employed at the time of the dissolution. Betty contends that at age 50, with only a high school education and no particular skills, there was no evidence she could support herself. She further argues that her standard of living, acquired in almost 25 years of marriage to Harry, of which dur-

ing the last several he was making about $100,000 a year, requires a greater award of maintenance. In *Brueggemann v. Brueggemann*, 551 S.W.2d 853, 857 (Mo.App.1977) the court stated:

> Reasonable needs as used in the statute [§ 452.335.1(1)] is a relative term. In a marriage of lengthy duration where one spouse has foregone career development, the marital standard of living may serve as an important guide in computing the spouse's reasonable needs. In a very practical sense it is frequently the best evidence of what the parties have together determined their "reasonable needs" to be.

That case further held the primary means of providing for the future financial needs of a spouse under the Dissolution of Marriage Act is the division of property. However, Betty was not awarded any income producing property, although she was awarded the $3,000 savings account.

Betty presented a breakdown of her financial needs totaling $2,567 per month to sustain her in the standard of living maintained during the marriage. She presented evidence from a CPA that maintenance on the part of Harry was tax deductible to him and taxable to Betty. She requested the court to award her $3,500 per month in maintenance to take into account her tax liability. The court made rather extensive findings of fact and conclusions of law and found Betty's itemization of living expenses to be excessive. The court found the $1,500 per month maintenance award to be reasonable and consistent with the factors set forth in § 452.355. The court further found Betty could obtain employment as a law office receptionist or a sales clerk.

It is apparent from the court's findings of fact that the standard of living established during the marriage was not specifically considered by the court in fixing the monthly maintenance award. During this 25 year marriage Betty functioned solely as a homemaker and mother for a daughter from the age of eight years through maturity. Obviously, Betty gave up any career development experience to devote herself to her marriage and her role as a mother. Harry does not contest the fact a maintenance award is proper, but insists $1,500 per month is sufficient. He claims she had not at trial time had to abandon her lifestyle because of a shortage of funds. However, after payment on the house mortgage, Betty had only $1,100 per month for all of her other expenses. Admittedly the Florida condominium with its golf club facilities and all the related expenses was well established as the parties' lifestyle. Harry did not contest Betty's expense list except as to mostly minor items. He did question her estimate of $300 per month for food, but at the same time listed the same amount for his own food expense in his list of expense.

Harry did have an expense of $2,000 per month to care for his 87 year old mother who was terminally ill. Obviously this could not continue for long. He was age 65, in good health, and engaged in full time practice with no indication of any diminution in his earnings.

■ This case calls for application of the rule stated in *Brueggemann*, supra. This court is of the firm opinion that the judgment awarding Betty $1,500 per month maintenance is against the weight of the evidence and is wrong because the trial court did not give sufficient weight to the marital standard of living. This court has carefully reviewed Betty's statement of her monthly financial needs and concludes that a reasonable amount, considering the marital standard of living, her age and chances of employment, together with all of the factors listed in § 452.335, is $1,900 per month.

■ Betty finally contends the court erred in refusing to order Harry to pay her attorney fees in the amount of $4,000. In *Roberts v. Roberts*, 553 S.W.2d 305, 307[6, 7] (Mo.App.1977) it was held the trial court is given broad discretion in the matter of awarding attorney fees. Section 452.355 provides the court *may* order a party to pay a reasonable amount for attorney fees. In view of all of the evidence in this case this court cannot find an abuse of discretion in

the refusal to order Harry to pay Betty's attorney fees.

The judgment awarding Betty the sum of $1,500 per month in maintenance is modified to order Harry to pay Betty $1,900 per month in maintenance, and in all other respects is affirmed. The increased maintenance as ordered herein shall be effective and shall be payable from the date the judgment was entered in the trial court. Phillips v. Phillips, 233 S.W.2d 775 (Mo. App.1950).

All concur.