**Myron E. MICHAEL,
Petitioner–Respondent,**

v.

**Patsy Ruth MICHAEL,
Respondent–Appellant.**

**No. WD 39404.**

Missouri Court of Appeals,
Western District.

Feb. 9, 1988.

As Modified on Denial of Rehearing
March 29, 1988.

Motion for Rehearing and/or Transfer
Denied March 29, 1988.

William C. Partin, Matt Partin, Kansas City, for respondent-appellant.

Robert G. Neds, Neds & Odneal, Kansas City, for petitioner-respondent.

Before GAITAN, P.J., and TURNAGE and CLARK, JJ.

TURNAGE, Judge.

Patsy Michael appeals from that portion of a dissolution decree which divided the marital property.[1] Patsy contends the court should have awarded her a greater percentage of the property because of misconduct on the part of Myron. Affirmed as modified.

Myron filed this action to dissolve his marriage with Patsy. The parties were married in 1956. There were two children born of the marriage; the older son is now emancipated, and the younger was tragically killed in an automobile accident.

Myron began working with his father, Charles, in an automobile service station while he was still in high school and continued working with his father in that business after he finished high school. Patsy went to art school after high school and later went to work for Hallmark. Myron and Patsy purchased their first home in 1956 with the proceeds from the sale of Patsy's automobile. Patsy continued work-

---

1. Myron Michael has filed a motion to dismiss the appeal because the statement of facts is claimed to violate Rule 84.04(c). The motion is overruled.

ing for Hallmark until after the birth of the second son. While Patsy was working in the early years of the marriage, the parties invested funds derived from Patsy's employment and the proceeds from loans obtained on their furniture to operate an automobile business.

In 1963, Myron and his father obtained a franchise to sell Datsun automobiles. Originally, the business was known as Michael Imports, but later the name was changed to Michael Datsun. Myron and his father were active in the conduct of the automobile business, and Patsy contributed by drawing signs and making advertising suggestions.

Michael Datsun flourished, and Myron and his father acquired the real estate on which the automobile business was conducted and also acquired other tracts of business property. In 1971, Myron and his father obtained a second Datsun franchise and opened Raytown Datsun. Through a separate corporation owned by Myron and his father, the real estate in Raytown on which Raytown Datsun was located was acquired.

Myron and Patsy acquired a home at Lake Winnebago. About 1975, Patsy noticed that Myron had started drinking heavily. In 1979, Myron and his father sold Raytown Datsun for a little over $1,000,000. In that same year, Myron stated that he wanted to build the biggest house in Lake Winnebago and undertook construction of a house that cost $500,000. Myron and Patsy moved into the new house in late 1979 or early 1980. The house had a mortgage of $125,000.

Early in 1980, Myron purchased the Lake Winnebago Marina. It was planned that Myron and Patsy would operate this business, but Myron initially hired a manager.

Also in early 1980, the parties had an argument, and Myron moved from the new house to the house they had occupied prior to building the bigger house. Patsy filed a dissolution action that was later dismissed. About this same time, Myron began an affair with a younger woman who had worked for him at one time. There was evidence that this relationship was conduct-ed openly around Lake Winnebago and that the young woman moved into the house with Myron. By the middle of 1980, Myron had ended his affair with the young woman and entered an alcohol recovery unit of a local hospital. In 1981, Myron and his father sold Michael Datsun. Myron continued his drinking, and by early 1984, his drinking had become so bad that the family told Patsy something had to be done. Patsy and the rest of the family convinced Myron to go to Menninger Clinic in Topeka. When he left the clinic, Patsy refused to live with him, and they have not lived together since that time.

In March of 1984, Myron and his father sold the real estate in Raytown on which Raytown Datsun was located. A wraparound note in the amount of $1,568,850 was received as part of the proceeds of the sale. That note constitutes the major asset in this action. The note was called a "wrap-around note" because it provided that three outstanding notes executed by Myron and his father were included in the total note. The amount payable to Myron and his father was $1,175,674.50, with the balance represented by the amount due on the three outstanding notes. The payment on the wrap-around note is $15,912.32 a month, beginning in April of 1984 and running through March of 1999. Myron owns a one-half interest in this note. In July and August of 1988, the three notes included in the wrap-around note will be paid in full, and from that time forward, Myron will be entitled to one-half the monthly payment, or $7,956.16 per month. Until the three notes included in the wrap-around note are paid, Myron's share of the wrap-around note is $3,348.52 per month.

In May of 1984, Patsy moved from the new house to a condo that she purchased in Overland Park. The purchase price came from a loan secured by a second mortgage on the big house. Earlier, a small house in Lee's Summit had been purchased for the use of Patsy's mother.

Soon after the separation, the parties' younger son was killed, and Myron experienced a recurrence of his drinking problems and was forced to enter a hospital.

Myron filed this dissolution action in early 1985. A little later, he decided to buy a smaller house at Lake Winnebago and moved out of the big house. By this time, the Marina had lost a considerable amount of money and was closed. The property was put on the market at a sale price of $220,000.

There was much evidence at trial concerning the income and spending of Myron.

At the time of trial, Myron was unemployed and was paying about $2,900 per month on mortgages on the big house and about $1,000 a month on the mortgage on the Marina. Patsy had opened a tea room and gallery in partnership with another woman after the separation. She stated that the business had not begun to generate an income by the time of the trial.

The court entered a decree that was the subject of an application for prohibition and an appeal to this court. By the decision in *Michael v. Michael*, 727 S.W.2d 424 (Mo. App.1987), this court held that the trial court did not have jurisdiction to appoint a receiver to sell the real estate because the court had failed to divide the property. This court prohibited the court from proceeding with the receivership and the sale of the property and dismissed the appeal because the trial court had not exhausted its jurisdiction. After remand, the trial court entered a judgment in which it valued the property to be divided at $1,573,951, subject to debts of $629,213, leaving a net value of $944,738.[2] The court found that because of his misconduct, Myron should receive 45 percent of the property and Patsy 55 percent. The court awarded cash and personal property, valued at $46,848, to Myron. In addition, Myron was awarded the smaller house at Lake Winnebago with a value of $160,000. The wrap-around note was divided, with 82.1 percent awarded to Myron and 17.9 percent awarded to Patsy. Debts in the amount of $287,515 were allocated to Myron.

In addition to the 17.9 percent of the wrap-around note, Patsy was awarded the big house, valued at $350,000, the Marina, valued at $220,000, her condo, valued at $85,000, the small house for her mother, valued at $28,500, and her tea room business, valued at $8,500. In addition, she was awarded personal property, valued at $59,500. Debts of $341,698 were allocated to Patsy. Included in these debts were the mortgages on the big house and the mortgage on the Marina, with payments totaling over $3,900 per month. Patsy had testified that she had no income. By the decree, she would receive $599 per month from her 17.9 percent share of the wrap-around note. Although the tea room was operating, she said that it was not profitable.[3]

On this appeal, Patsy complains that although she was awarded 55 percent of the property, she was also saddled with mortgage payments of about $3,900 per month, with an income of $599 to meet those payments. She contends that the court should have awarded her a larger percentage of the property because of Myron's misconduct.[4]

In her appeal, Patsy directs attention primarily at the big house, which was awarded to her with its mortgages, and the 17.9 percent interest awarded to her in the wrap-around note.

In *Dardick v. Dardick*, 670 S.W.2d 865, 868[3] (Mo. banc 1984), the court stated that the division of marital property is consigned to the sound discretion of the trial court and that this court must defer to the trial court's judgment unless the judgment is improper under *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), or an abuse of discretion is shown.

A review of the evidence in this case does not convince this court that the division of the property in the proportion of 55 percent to Patsy and 45 percent to Myron

---

2. There was no dispute as to the value of the property.

3. Neither party requested maintenance, and none was granted. Nor was any award of attorney fees made.

4. Each party was granted a one-half interest in the claim for damages for the death of the son.

was an abuse of discretion. However, the awarding to Patsy of the big house and the Marina, with their high mortgage payment demands each month, creates an impossible burden on Patsy and was an abuse of discretion. This burden could only result in the forced liquidation of those properties, which would drastically reduce the opportunity to realize their market value.

The big house was Myron's dream. He lives at Lake Winnebago in close proximity to the house and he is in a position to take care of it and seek to make an orderly sale in the event that he still desires to dispose of it. By awarding the big house to Myron, Patsy will be relieved from the impossible monthly payments. By increasing Patsy's percentage in the wrap-around note to 41.23 percent and by awarding the big house to Myron, the court's percentage of 55 percent to Patsy and 45 percent to Myron can be maintained.[5] With this modification, Myron would receive property with a value of $556,884, plus his 58.77 percent interest in the wrap-around note, with a value of $361,763. His total property would be $918,647. Debts allocated to him would total $493,515. Patsy would receive property valued at $401,500 plus her 41.23 percent of the wrap-around note, with a value of $253,805. Her total property would be $655,305. Debts allocated to her would total $135,698.

The net property awarded to Myron would be $425,132, and the net to Patsy would be $519,607.[6]

This cause is remanded to the trial court, with directions to modify the decree by awarding 208 Winnebago and allocating the indebtness thereon to Myron. The decree is to be modified to award Myron 58.77 percent of the wrap-around note and to award Patsy 41.23 percent of the wrap-around note. The award of 208 Winnebago to Patsy, and allocating its indebtedness to her, is to be eliminated. In all other respects, the decree is affirmed. This modification shall be effective from April 10, 1987, the date of the decree. *In Re Marriage of Morris*, 588 S.W.2d 39, 46 (Mo. App.1979). Costs are divided equally between the parties.

All concur.

---

5. Under the disposition herein, from April, 1987, until the three notes are paid, the share of the wrap-around going to Myron would be divided as follows: $1,968 to him and $1,380 to Patsy. After the three notes are paid, Myron's share would be divided, with $4,676 going to him and $3,280 to Patsy.

6. Because of rounding, the total shown exceeds the total value of all property by one dollar.