102 S.W.3d 93 (2003)
D.K.H., Appellant-Respondent,
v.
L.R.G., Respondent-Appellant.
No. WD 59871.
Missouri Court of Appeals, Western District.
April 15, 2003.
*95 Karen A. Plax, Kansas City, MO, for appellant-respondent.
Anita I. Rodarte, Kansas City, MO, for respondent-appellant.
Before SPINDEN, P.J., BRECKENRIDGE and NEWTON, JJ.
PATRICIA BRECKENRIDGE, Judge.
D.K.H. (Husband) and L.R.G. (Wife) appeal the trial court's judgment dissolving their marriage. In his points on appeal, Husband alleges the trial court erred in identifying Wife's interest in a contract for deed as Wife's separate, non-marital property; overvaluing Husband's interest in his medical practice; and dividing the marital property, in light of the errors the court made in identifying the contract for deed as non-marital and overvaluing his interest in his medical practice. In her points on appeal, Wife alleges error in the court's order denying her request for maintenance and in making that order non-modifiable. This court finds that the trial court did not err in identifying, valuing, or dividing the parties' property, so those portions of the judgment are affirmed. Because the record is insufficient for this court to determine whether the court's denial of Wife's request for maintenance was correct, the maintenance order is reversed, and the cause is remanded to the trial court to hear further evidence and reconsider the maintenance issue.

I. Factual and Procedural Background
Husband and Wife were married June 7, 1980, and separated in December 1998. They did not have any children during the marriage. Husband, a physician, has been a shareholder in Neurology Consultants, Chartered since 1990. Wife has a law degree, and has been employed as an attorney, an assistant municipal prosecutor, *96 and in city government. At the time of the trial, Wife was employed part-time as a clerk in a clothing store. During the marriage, Husband and Wife also worked for their corporation, "Five Gaited Properties," which was a horse showing and breeding business that they formed in January 1993.
For the past thirty years, Wife has suffered from mental health disorders, particularly chronic depression. The symptoms of Wife's chronic depression included anxiety, severe insomnia, and chronic migraine headaches. Between 1996 and 1998, Wife lapsed into an acute and deep state of depression. During that time, she had periods where she was nonfunctional to the point of not being able to leave the house, not being able to care for herself, and requiring supervision. In 1997, Wife received twenty electroshock therapy treatments, which were unsuccessful. Wife was hospitalized for her depression on three separate occasions in 1997 and three separate occasions in 1998. Wife's severe depression subsided in the fall of 1998. According to Wife's psychiatrist, by the time of the trial in early 2001, Wife's condition varied, in that she had periods of improvement followed by relapses. Because of Wife's fluctuating condition, Wife's psychiatrist recommended that she work only part-time until she becomes more functional.
Husband filed his petition for dissolution of marriage in May 1999 and later amended it in July 1999. Trial was held in late January and early February 2001. Following the entry of the court's judgment dissolving their marriage, dividing their property, and denying Wife's request for maintenance on February 20, 2001, both Husband and Wife appealed. Additional facts will be set forth in the opinion where relevant to the issues raised.

II. Standard of Review
A dissolution of marriage judgment will be affirmed unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. Henning v. Henning, 72 S.W.3d 241, 245 (Mo.App.2002). This court views the evidence and inferences in the light most favorable to the trial court's judgment and disregards all contrary evidence and inferences. Id.
The court has broad discretion in identifying marital property, Luckeroth v. Weng, 53 S.W.3d 603, 609 (Mo.App.2001); valuing marital property, Farley v. Farley, 51 S.W.3d 159, 164 (Mo.App.2001); and distributing marital property, Henning, 72 S.W.3d at 245. Likewise, the trial court has broad discretion in determining whether to award maintenance. Id. This court will not disturb the trial court's property or maintenance award absent an abuse of discretion. Id. The trial court abuses its discretion only if the "ruling is clearly against the logic of the circumstances then before it and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." Wright v. Wright, 1 S.W.3d 52, 57 (Mo. App.1999). "`If reasonable persons can differ about the propriety of the trial court's action, it cannot be said that the trial court abused its discretion.'" Id. (quoting Collins v. Collins, 875 S.W.2d 643, 647 (Mo.App.1994)).
Where the court's identification of property as marital or separate turns on a determination of the credibility of witnesses, this court defers to the trial court's determination. Beckham v. Beckham, 41 S.W.3d 908, 911-12 (Mo.App.2001). Also, where there is conflicting evidence regarding valuation of property, this court defers to the trial court's resolution of the conflict. McGowan v. McGowan, 43 S.W.3d *97 857, 864 (Mo.App.2001). "When the trial court's valuation of property is within the range of conflicting evidence of value offered at trial, the court acts within its discretion to resolve conflicts in evidence." Taylor v. Taylor, 25 S.W.3d 634, 644 (Mo. App.2000).

III. Husband's Appeal

A. Property Underlying Contract For Deed was Non-Marital
Husband's first two points concern the trial court's finding that Wife's interest in real estate and a contract for deed was Wife's separate, non-marital property. In his first point, Husband argues that the property underlying the contract for deed was marital property. In his second point, Husband argues that, even if the underlying property was non-marital when Wife purchased it, Wife's interest in the subsequent contract for deed was transmuted into marital property by the time of the dissolution.
Wife purchased the property, which was located in Leavenworth County, Kansas, on February 28, 1993. The parties referred to the property as "Camp Gaea" or "the Camp property." Wife paid approximately $225,000 in cash for the property, and titled it in her name only. Five months later, Wife entered into a contract for deed to sell the property to Earth Rising, Inc., a group to which she belonged. Like the title to the property, the contract for deed was solely in Wife's name. Under the terms of the contract for deed, Earth Rising was to make a payment of $10,660.66 on the date the contract was signed, and then make semi-annual payments in that amount to Wife only, beginning January 1, 1994, until September 1, 2003. On that date, a balloon payment of the remaining principal and accrued interest at nine percent is due.
There is a statutory presumption that all property acquired by either spouse subsequent to marriage but before a legal decree of separation or dissolution is marital property, regardless of how the property is titled. Section 452.330.3, RSMo 2000.[1] This presumption may be overcome, however, by showing that the property was acquired by one of the methods listed in section 452.330.2. Section 452.330.3. The methods listed in section 452.330.2 are:
(1) Property acquired by gift, bequest, devise, or descent;
(2) Property acquired in exchange for property acquired prior to the marriage or in exchange for property acquired by gift, bequest, devise, or descent;
(3) Property acquired by a spouse after a decree of legal separation;
(4) Property excluded by valid written agreement of the parties; and
(5) The increase in value of property acquired prior to the marriage or pursuant to subdivisions (1) to (4) of this subsection, unless marital assets including labor, have contributed to such increases and then only to the extent of such contributions.
The party claiming the property is separate property has the burden of proving it by clear and convincing evidence. King v. King, 66 S.W.3d 28, 36 (Mo.App.2001).
To rebut the statutory presumption that the Camp property was marital property, Wife testified that she purchased the property with funds she had inherited from her father. After Wife's father died in 1981, Wife began receiving distributions from her father's estate. Wife put these distributions into "a whole lot of different accounts," *98 including Husband and Wife's joint accounts. In 1992, Wife received the largest distribution from her father's estate. The amount of this distribution was $685,285. Wife put the funds from this distribution in a Prudential Securities Money Market Account in her name only. To support this testimony, Wife offered a statement from Prudential showing that as of December 31, 1992, she had $685,285 in a money market account in her name.
Wife testified that she used funds from this account to purchase the Camp property two months later in February 1993. According to Wife, she and Husband had not saved $225,000 in marital funds up to that point in their marriage, and they had no other brokerage accounts that held an amount close to $225,000.
Husband contends that this evidence was insufficient to support the court's finding that the Camp property was Wife's separate property. Husband argues that Wife's testimony is not credible because, while she testified that the funds for the purchase came from the $685,285 distribution, she later testified that she "presumed" the funds came from that distribution and also that she could not say "for certain" that the funds came from that distribution. Additionally, Wife testified that she was unable to locate any documents to support her testimony. Husband notes that Wife repeatedly testified that she could not remember financial details. Moreover, Husband argues that between 1988 and 1993, he earned over one million dollars in income, so there were other funds that could have been used to purchase the Camp property.
The trial court was "free to believe or disbelieve all, part, or none of the testimony given by any of the witnesses," however. Thill v. Thill, 26 S.W.3d 199, 203 (Mo.App.2000). Clearly, the trial court chose to believe Wife's testimony that the funds to purchase the Camp property came from the $685,285 distribution. As this court has stated, where the court's identification of property as marital or separate turns on a determination of the credibility of witnesses, this court will defer to the trial court's determination. Beckham, 41 S.W.3d at 911-12. Thus, this court will defer to the trial court's decision to accept Wife's testimony that she used her inheritance to purchase the Camp property.
Moreover, contrary to Husband's assertion, there was other evidence in the record to support this testimony. Both Husband and Wife testified that during their marriage, Husband was primarily responsible for handling the parties' financial affairs. Nevertheless, Husband testified that he had no "specific recollection" of whether he and Wife had saved enough from his earnings to purchase the Camp property out of their marital funds. Indeed, Husband acknowledged that the Camp property was the one asset that he was not involved in purchasing, and that was because the reason behind the purchase of the Camp property and the subsequent contract for deed to Earth Rising was "solely" Wife's, as it was something she wanted to do. Husband testified that he "had qualms" about purchasing the property and selling it through a contract for deed to Earth Rising. According to Wife, Husband said numerous times that "he wished he could get his hands on the money that [Wife] had spent on the Camp." Additionally, Husband testified that although he and Wife titled "virtually all" of their assets jointly because they generally did not "sequester[ ] money in separately titled accounts," the Camp property was the one asset that was not jointly titled. That even Husband treated the purchase of the Camp property differently from the purchase of any of the parties' other assets supports, rather than *99 refutes, Wife's testimony that she purchased the Camp property with her separate funds.
Husband further argues that the court erred in relying on Wife's testimony that she used part of the $685,285 distribution to purchase the Camp property because the evidence showed that the Prudential account containing the $685,285 distribution from Wife's father's estate had been spent down to $46,285 by the time the Camp property was purchased on February 28, 1993. Husband notes that Wife testified that they paid approximately $200,000 in estimated taxes on this distribution.[2] Because their 1992 tax return does not show a penalty for underpayment of estimated taxes, Husband assumes that the estimated taxes were paid by January 15, 1993. Also, Husband contends that Wife testified that she used $339,000 of the $685,285 to purchase horses for the parties' horse showing and breeding business, Five Gaited Properties. Thus, Husband argues, the remaining funds from the $685,285 distribution were insufficient to pay the $225,000 purchase price for the Camp property.
The problem with Husband's argument is that while it is true that Wife testified that $200,000 in estimated taxes were paid on the $685,285 distribution, Wife never testified that the estimated taxes were paid directly out of the distribution. Thus, even if this court were to assume, without any evidence in the record, that the entire $200,000 in estimated taxes were paid by January 15, 1993, there is no evidence to support Husband's contention that the estimated taxes were paid out of the $685,285. Also, although Wife testified that she agreed that the $339,000 worth of horses purchased in 1993 "became marital assets by being part of [Five Gaited Properties]," she did not testify that the $339,000 came from the $685,285 inheritance distribution. Nor did Wife testify that the horses were purchased prior to the purchase of the Camp property. The evidence was only that the horses were purchased in the same year as the Camp property. Even if the $339,000 did come from the $685,285 distribution, however, the remaining amount, $346,285, was more than sufficient to cover the purchase price of the Camp property. There was clear and convincing evidence that Wife purchased the Camp property with funds she had inherited from her father. Therefore, the court did not err in finding that the Camp property was Wife's separate property. Section 452.330.2(2). Husband's first point is denied.

B. Contract For Deed Not Transmuted Into Marital Property
In his second point, Husband argues that even if the Camp property was non-marital when Wife purchased it, Wife's interest in the subsequent contract for deed on the property was transmuted into marital property by the time of the dissolution. The presumption that non-marital property has been transmuted to marital property arises where a spouse's name has been added to the title. Beckham, 41 S.W.3d at 912. In this case, the Camp property and the subsequent contract for deed remained titled in Wife's name only and all payments on the contract for deed were made in Wife's name only, so the presumption of transmutation through joint titling of the property is not applicable to this case. Transmutation may also occur "`[w]here the parties continually *100 commingle marital assets and earnings, and treat property as communal.'" Id. (quoting Cuda v. Cuda, 906 S.W.2d 757, 759 (Mo.App.1995)). Non-marital property does not become marital property "solely because it may have become commingled with marital property," however. Section 452.330.4. Rather, the owner's intent to convert the property to marital property is the determining factor. Kinsey-Geujen v. Geujen, 984 S.W.2d 577, 579 (Mo.App. 1999).
Husband argues that Wife continuously commingled the contract for deed payments with marital property and, in doing so, transmuted the contract for deed and all remaining payments on the contract for deed into marital property. Specifically, Husband claims that in 1993, he and Wife agreed that their horse business, Five Gaited Properties, needed to show a profit. According to Husband, he and Wife made a joint decision to make the contract for deed an asset of their horse business, Five Gaited Properties, and list all of the income from the contract for deed payments as income to the corporation. Husband contends that Wife told him that she would handle the paperwork, and he assumed that Wife, as an attorney, would instruct the corporation's attorney to formally transfer the contract for deed to Five Gaited Properties. Husband testified that he was unaware, until the dissolution proceeding was initiated, that Wife had never taken any steps to effectuate the formal transfer.
Nevertheless, beginning in 1994, when Wife received the payments from Earth Rising, she deposited the money into Five Gaited Properties' account. Husband offered Five Gaited Properties' tax returns for 1994, 1995, 1996, and 1998, which listed the contract for deed payments as income to the corporation from the sale of business property. Also, Husband offered Five Gaited Properties' balance sheets for 1994 through 1999, which also listed the contract for deed payments as "interest/loan payments." Because Wife was the primary bookkeeper for Five Gaited Properties for several of these years, Husband argues that Wife was aware that the payments were listed as income to the corporation from sales of business property and intended that the contract for deed be considered an asset of the corporation.
Wife testified, however, that she did not know how the payments were being reported on the corporation's tax returns and balance sheets until after she and Husband separated. Although Wife acknowledged that she kept the books for the corporation for several years, Husband gathered the tax information to give to the corporation's accountant, and Husband prepared the balance sheets. Moreover, Wife testified that she "certainly" did not recall ever having a conversation with Husband about giving the Camp property or the contract for deed to Five Gaited Properties, and that is why she never took steps to formally transfer the contract for deed to the corporation.
Wife testified that she gave the contract for deed payments to Five Gaited Properties only because she wanted to help with the corporation's expenses, and there was no other connection between the Camp property and Five Gaited Properties. According to Wife, while she chose to give the payments to the corporation, she had no intention of ever transferring the contract for deed to Five Gaited Properties or to anyone. Wife testified that it was always her intention that the Camp property and the contract for deed remain her separate property.
The trial court was free to believe Wife's testimony that she was unaware of how the contract for deed payments were being reported on the corporation's tax returns, *101 and that she intended to keep the contract for deed and the underlying property as her separate property. See Thill, 26 S.W.3d at 203. The contract for deed payments Wife chose to give the corporation until the parties' separation clearly were commingled with a marital asset and became marital property by virtue of this commingling and Wife's intention that they become marital property. The contract for deed itself and the underlying property, however, were never commingled with marital property, and no marital assets or efforts were contributed to the contract for deed or the underlying property. Thus, this case is distinguishable from the cases Husband relies upon to support his argument that the parties commingled the contract for deed and the underlying property with marital property and treated them as communal property.[3] Deferring to the trial court's credibility determination, Beckham, 41 S.W.3d at 911-12, this court finds that Wife's testimony and the other evidence on this issue supports a finding that transmutation did not occur. The trial court did not err in finding Wife's interest in the contract for deed to be Wife's separate property. Husband's second point is denied.

C. No Error in Valuing Husband's Interest in Medical Practice
In his third point, Husband argues that the court erred in valuing his interest as a shareholder in his medical practice, Neurology Consultants, Chartered, a C corporation, because the court's valuation was against the weight of the evidence. At the time of the dissolution, Husband had a one-quarter interest in the medical practice, which he purchased in 1990 for $110,000. As evidence of Husband's present interest in the medical practice, Wife offered the testimony of Richard A. Couch, a certified public accountant and certified evaluation analyst. Mr. Couch testified that he valued Husband's present interest in the medical practice by computing the asset value of the business, which is the method Mr. Couch would expect Husband to use if he were selling his shares to a third party as provided for under Article III of Neurology Consultants' shareholders' agreement. The asset value of a business is determined by subtracting the business's liabilities from its assets, and then dividing this number by the number of shareholders. Using this calculation, Mr. Couch determined the present value of Husband's interest in Neurology Consultants to be $67,688. The court adopted this valuation.
Husband argues that the court erred in adopting this valuation and, instead, should have adopted the valuation assigned by his expert, John P. Corbin, a certified public accountant and accredited business appraiser. Mr. Corbin testified that he valued Husband's present interest in the medical practice by using a formula provided for in Neurology Consultants' shareholders' agreement for valuing the interest of a shareholder who dies, becomes disabled, or otherwise terminates employment. *102 Under this formula, Mr. Corbin added together Husband's accounts receivable, severance pay, and the purchase price of Husband's common stock. Because all three of these calculations yielded negative numbers, Mr. Corbin valued Husband's interest in the medical practice to be in the range of negative $74,457 to zero.
Husband contends that Mr. Corbin's valuation method was more accurate than Mr. Couch's because Mr. Couch failed to discount the value for the lack of marketability of a minority interest arising from restrictions in the shareholders' agreement. The shareholders' agreement provides that a shareholder cannot transfer his shares to a third party without giving the remaining shareholders the right of first refusal to purchase his shares. Also, the remaining shareholders have the right to determine the compensation of the new shareholder, and by controlling the compensation, Neurology Consultants can make it unprofitable for a third party to purchase the shares. Thus, Husband contends it would be impractical for him to sell his interest to a third party because there would be no willing buyer or willing seller, so the scenario upon which Mr. Couch based his valuation is unrealistic. Additionally, Husband argues that the court should have adopted Mr. Corbin's valuation because that was the method used to value the shares of a terminated shareholder in 1998.
Contrary to Husband's argument, however, the court was not bound to accept any of the valuation methods provided for in the shareholders' agreement, including the method used to value the shares of a terminated shareholder. The court's objective was to find the true or actual value of Husband's marital interest in the medical practice. In re Marriage of Morris, 588 S.W.2d 39, 43 (Mo.App.1979). See also Hanson v. Hanson, 738 S.W.2d 429, 436 (Mo. banc 1987) (stating a strong preference for using the fair market value approach to find the true value of the goodwill of an enterprise for dissolution purposes). In making this determination, the court is not bound by the methods provided in the shareholders' agreement, because valuation for purposes of a marriage dissolution is not a situation contemplated by the agreement. Morris, 588 S.W.2d at 43-44; L.R.M. v. R.K.M., 46 S.W.3d 24, 29 (Mo.App.2001); State ex rel. Kuehl v. Baker, 663 S.W.2d 410, 411-12 (Mo.App.1983). Instead, the court may receive any relevant evidence on the issue of value. Morris, 588 S.W.2d at 44; L.R.M., 46 S.W.3d at 29.
In this case, Mr. Couch testified that the reason he applied the asset valuation method rather than the method used for the termination of employment was because his objective was to find the fair market value of Husband's present interest. The concept of fair market value presumes the existence of a willing buyer and a willing seller, so Mr. Couch did not believe it was appropriate to apply the method used for termination of employment, which implies a compelled transfer of shares. Likewise, because of the presumption of a willing buyer and a willing seller, Mr. Couch did not believe it was necessary to discount the value due to the restrictions contained in the shareholders' agreement. This evidence was sufficient to support the trial court's finding that the fair market value of Husband's interest in Neurology Consultants was $67,688, and such finding was not against the weight of the evidence. Husband's third point is denied.

D. Division of Marital Property Remains the Same
In his fourth point, Husband argues that the combination of errors he asserted in *103 his first three points rendered the trial court's division of property unequal, which is inconsistent with the trial court's finding that the marital property should be "divided on a relatively equal basis." This court has rejected Husband's claims that the trial court erred in its identification of Wife's interest in the contract for deed and its valuation of Husband's interest in his medical practice. Because the court's division of the marital property remains the same, Husband's fourth point does not need to be addressed.

IV. Wife's Appeal

Record Insufficient as to Income From Wife's Assets
In her first point, Wife argues that the trial court erred in denying her request for maintenance because substantial evidence established that the property awarded to Wife did not generate sufficient income to meet her reasonable needs. The trial court can award maintenance only if it finds that the party seeking maintenance: "(1) Lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs; and (2) Is unable to support himself through appropriate employment." Section 452.335.1. In applying this standard, the trial court must first determine the reasonable needs of the party seeking maintenance. Henning, 72 S.W.3d at 247. After the court determines the party's reasonable needs, the court must then determine whether the party "is able to provide for these needs through use of property or appropriate employment." Id.
In this case, the trial court did not award Wife any maintenance because it found that Wife had been awarded non-marital property that was "minimally valued at $682,468.00," and marital property valued at $547,132.04. The court found that these resources alone are sufficient to provide for Wife's reasonable monthly expenses of $5,567. Although Wife had claimed at trial that her reasonable monthly expenses average $10,700, Wife does not dispute on appeal the court's finding that her reasonable monthly expenses are only $5,567. Instead, Wife argues that the trial court erred because substantial evidence established that Wife's assets do not generate enough income to meet these expenses.
It should be noted at the outset that to support her argument that her assets do not generate sufficient income to meet her expenses, Wife applies a 5% projected annual rate of return on all of her income-generating assets. It is true, as Wife contends, that other cases have applied a 5% rate of return in determining potential income from investments. See Hosack v. Hosack, 973 S.W.2d 863, 871 (Mo.App. 1998); Nelson v. Nelson, 937 S.W.2d 753, 756 (Mo.App.1997). In Hosack, the court applied a 5% rate of return in determining whether the denial of maintenance to Wife was appropriate because Husband conceded that 5% was a reasonable rate of return on Wife's assets. 973 S.W.2d at 871. In Nelson, the court applied a "modest return of 5%" in determining whether the denial of maintenance to Wife was appropriate where the record did not indicate evidence of any other projected rate of return. 937 S.W.2d at 756.
The problem with using a 5% projected annual rate of return in this case is that, during the trial, Wife offered the expert testimony of Sandy Weaver, a certified public accountant and certified financial planner, as to projected rates of return on one of Wife's investment accounts. Ms. Weaver testified that she prepared two investment scenarios for Wife's Dain Rauscher account. Ms. Weaver described one of the investment scenarios as "very conservative," and projected an annual *104 rate of return of 7.5%. Ms. Weaver described the other investment scenario as "moderate," and projected an annual rate of return of 9.1%. Ms. Weaver did not testify as to projected rates of return for any of Wife's other income-producing assets. Nevertheless, a reasonable inference from Ms. Weaver's testimony is that Wife could receive the same rates of return if she invested her remaining income-producing assets using similar investment scenarios.
As between Ms. Weaver's projected rates of return, the rate in the light most favorable to the trial court's judgment is the 9.1% rate. While this projected rate of return may, in hindsight, be high, it was Wife who offered Ms. Weaver's testimony. Having offered this high projected rate of return, Wife cannot now complain that the court erred by not using a lower rate. "A party cannot lead a trial court into error and then employ the error as a source of complaint on appeal." In re Marriage of Heirigs, 34 S.W.3d 835, 840 (Mo.App.2000). Therefore, in analyzing whether Wife's income-producing assets are sufficient to meet her reasonable needs, this court will use Wife's expert's projected rate of return of 9.1% in determining Wife's monthly income from the asset, if no other evidence of the actual monthly income or rate of return was offered into evidence.
The income-producing assets awarded to Wife include her Dain Rauscher investment portfolio account, valued at $354,938.18. Using the 9.1% rate of return, Wife's projected monthly income from this account is $2,691.61.
Another income-producing asset awarded to Wife is the contract for deed on the Camp property, valued at $154,530. Under the contract, Wife is to receive semi-annual payments of $10,660.66 until September 2003. Per the amortization schedule offered into evidence, the semi-annual payments in 2001, combined, consist of $7,253.86 in principal and $14,067.38 in interest. The semi-annual payments in 2002, combined, consist of $7,921.39 in principal and $13,399.85 in interest. While the return of principal would be available to invest, and could generate Wife a return of 9.1%, the principal itself cannot be included in the calculation of income available to Wife. In September 2003, Wife is to receive a balloon payment of $140,492.45 in principal and accrued interest. If Wife invests the balloon payment and the principal portion of the 2001 and 2002 payments, per Ms. Weaver's projected rate of return of 9.1%, Wife's monthly income after September 2003 will be $1,180.48.
Other income-producing assets awarded to Wife include interests in four limited partnerships. Wife's interest in two of these limited partnerships was valued at $7,000 total. Again, using the 9.1% rate of return, Wife's monthly income from these two limited partnership interests is $53. The value of Wife's interest in the other two limited partnerships is unknown, however, there was evidence that Wife's monthly income from these two limited partnerships is $147.58.
The court also awarded Wife cash or cash equivalents with a total value of $71,975.04. Investing this amount at a 9.1% rate of return, Wife's monthly income from the cash or cash equivalents awarded to her is $545.81.
The total projected monthly income from the Dain Rauscher account, the contract for deed, Wife's interest in the limited partnerships, and the cash or cash equivalents in 2001 is approximately $4,610.28, and in 2002, is approximately *105 $4,554.65.[4] After the contract for deed is paid off in September 2003, Wife's projected monthly income from these sources will be $4,618.48. These projected monthly income figures fall over $900 short of Wife's reasonable monthly expenses of $5,567.[5]
Husband argues that Wife has other non-income producing assets that she could sell to generate more investment income. Specifically, Husband notes that Wife has an interest worth $76,000 in a condominium that she inherited from her mother. Also, the court awarded Wife two cars, one of which was a Mercedes, valued at $10,000, that Husband had given to her as an anniversary present. Husband argues that Wife could sell both the condominium and the Mercedes and invest the proceeds to increase her monthly income.
Although Wife testified that she hoped to sell the condominium at some point in the future for a profit so that she could invest the proceeds, the condominium was not on the market at the time of the trial, and there was no indication in the record of when it would sell. Likewise, there was no indication in the record that Wife planned to sell the Mercedes. In fact, Wife testified that she was "somewhat hesitant" to sell the vehicle because of its sentimental value to her. In any event, "[W]ife was not required to deplete her own assets or to consume the marital property before being entitled to maintenance." Schroeder v. Schroeder, 924 S.W.2d 22, 25 (Mo.App.1996). Husband argues that while Wife was not required to consume or deplete her assets to meet her reasonable needs, Wife could be required to use a portion of her assets to meet her reasonable needs. This court has rejected this argument before, holding that "[r]egardless of the word chosen, ... the cases do not require the party to use his or her portion of the property division to meet his or her expenses." Anderson v. Anderson, 5 S.W.3d 535, 537 (Mo.App.1999). Moreover, even if Wife did sell the condominium and the Mercedes, the proceeds from the sales, invested at a 9.1% rate of return, would still not generate sufficient income to meet her monthly expenses.
The only other income-producing assets awarded to Wife were her IRA and a one-half interest in two of Husband's retirement accounts from Neurology Consultants. The total value of Wife's interest in these retirement accounts is $341,459. The Supreme Court has held that income from IRA and retirement accounts must be considered in determining a maintenance award. Hill v. Hill, 53 S.W.3d 114, 116 (Mo. banc 2001). In Hill, the Court listed factors the trial court should consider in determining whether, and how much, to impute from retirement accounts:
The trial court determines the amount of incomeif anyimputed from these accounts based on the facts and circumstances of each caseincluding the cost to convert the account into cash, the age of the parties, their intent as to investment/consumption/retirement, the relative division of marital property and marital debts, and any equitable adjustment *106 for reasonably certain taxes and penalties.
Id. at 116.
As Hill was decided after the judgment was entered in this case, the record is insufficient for this court to apply these factors to determine, with any reasonable certainty, whether Wife's interest in these retirement accounts was "income-producing and, if so, whether any amount should be imputed therefrom." Cohen v. Cohen, 73 S.W.3d 39, 49 (Mo.App.2002). The domestic relations order entered by the court simultaneously with the judgment indicates that Wife's share "shall be immediately payable in a lump-sum form of benefit or such other form as [Wife] elects as permitted under the Plan." The record does not show whether Wife's share was immediately payable to her under the terms of the plans and, if so, whether she would incur costs, taxes, or penalties. The gap between Wife's reasonable monthly expenses and Wife's income from her non-retirement accounts, particularly after the contract for deed is paid off in September 2003, indicates that the trial court did impute income from these retirement accounts, since the trial court denied maintenance solely on the basis of Wife's income from her assets and not her employment.[6] On the record before this court, however, it is unclear whether it was appropriate under Hill for the trial court have imputed income from Wife's interest in these retirement accounts to her.
Therefore, the trial court's decision to deny maintenance to Wife is reversed. The cause is remanded to the trial court to hear evidence regarding the factors listed in Hill. The trial court should then determine whether, based upon those factors, income from Wife's interest in Husband's retirement accounts should be imputed to her and, if so, in what amount. After making that determination, the court should consider whether Wife has sufficient property to provide for her reasonable needs. If the court finds that Wife does not have sufficient property to provide for her reasonable needs, the court should then consider, as required by section 452.335.1, whether Wife's reasonable needs can be met through appropriate employment. The court should also consider all relevant factors under section 452.335.2. After the court makes its decision to grant or deny Wife's request for maintenance, the court should then determine whether the maintenance order should be modifiable or non-modifiable. Section 452.335.3. Because of the passage of time since the case was tried, the trial court may receive additional evidence of the present circumstances in determining all of these issues. See Burnett v. Burnett, 18 S.W.3d 27, 33 (Mo.App.2000).
Wife's first point on appeal is granted. Since this court is reversing and remanding for the trial court to reconsider the maintenance order in its entirety, Wife's remaining two points concerning the impact of her income from employment on her eligibility for maintenance and the modifiability of the maintenance order need not be addressed.

V. Conclusion
The trial court did not err in identifying, valuing, or dividing the parties' property. Those portions of the judgment are affirmed. The record is insufficient for this court to determine whether Wife's income-producing property is adequate to meet *107 her reasonable needs. Therefore, the maintenance order is reversed, and the cause is remanded to the trial court to reconsider the maintenance issue.
All concur.
NOTES
[1] All statutory references are to the Revised Statutes of Missouri 2000.
[2] Generally, income tax is not owed on an inheritance. In this case, however, the parties' 1992 joint income tax return designated Wife's inheritance of $685,285 as income from IRA distributions, and income tax was paid on it.
[3] Husband cites Beckham, 41 S.W.3d at 912-14 (holding that home purchased with spouse's separate funds prior to marriage was transmuted into marital property because mortgage payments made from joint account, home was used as marital residence, and both parties devoted resources and energy into home); Cuda v. Cuda, 906 S.W.2d 757, 759 (Mo.App.1995) (holding that furniture and furnishings for marital residence purchased with separate funds were transmuted into marital property because they were acquired and treated as communal property); True v. True, 762 S.W.2d 489, 492-93 (Mo.App.1988) (holding that home purchased with separate funds and titled in one spouse's name was transmuted into marital property because home was used as marital residence and the other spouse contributed to payments and repairs on home).
[4] Wife's monthly income would be an estimated $55 higher in 2001, and an estimated $115 higher in 2002, if Wife invested the 2001 and 2002 principal payments on the contract for deed and received a rate of return of 9.1%.
[5] The record does not indicate what expenses are included in the trial court's figure of $5,567. Wife will owe taxes on her income and must either make monthly payments on her debts of $58,000 or use that amount of cash or cash equivalents to pay off her debts. Under our standard of review, it is presumed that the trial court considered these issues when it determined that Wife's reasonable monthly expenses were $5,567.
[6] Although Wife's second point of error alleges that the trial court "tacitly" found that Wife's reasonable needs could be met through appropriate employment, the trial court's judgment clearly indicates that it based its denial of maintenance solely on the sufficiency of the property awarded to her and did not reach the issue of Wife's employment income.