James Taylor SPARKS, Respondent,

v.

Elizabeth Anne SPARKS, Appellant.

No. WD 76014.

Missouri Court of Appeals,
Western District.

Nov. 26, 2013.

272

Sarah E. Recker, Parkville, MO, for Respondent.

William Hudnall, Kansas City, MO, for Appellant.

Before Division Three: KAREN KING MITCHELL, Presiding Judge, and LISA WHITE HARDWICK and GARY D. WITT, Judges.

KAREN KING MITCHELL, Presiding Judge.

Elizabeth Anne Sparks (Wife) appeals the trial court's judgment dissolving her marriage to James T. Sparks (Husband). Wife raises nine points of error on appeal related to the distribution of marital assets and the award of maintenance. Finding no error, we affirm the judgment of the trial court, as amended by this opinion.

### Factual and Procedural Background[1]

■ Husband and Wife married in November 1991 and separated in April 2010. Three children were born of the marriage, and they were ages fourteen, twelve, and nine at the time of the divorce.[2] Husband is a doctor of veterinary medicine (DVM) who owns and operates his practice, Eagle Animal Hospital (EAH), in Riverside, Missouri. Wife was not employed during the marriage until after the separation, when she began working part time as an office manager.

Husband filed a petition for dissolution of marriage in March 2011, Wife filed a counter-petition in April 2011, and a trial was held on October 3 and 10, 2012. The trial court issued its dissolution decree on November 26, 2012.

### Expert Testimony Regarding the Value of EAH and Husband's Income

The parties owned the following marital assets that are central to this appeal: EAH; Sparks, LLC, a company that owns the commercial building in which EAH is located; the marital home; and retirement accounts. The parties stipulated to the value of both the marital home ($204,000) and the commercial property owned by Sparks, LLC ($950,000).[3] The retirement accounts had a balance of approximately $204,000. The parties did not agree on the value of EAH, nor did they agree on the amount of Husband's projected income.

Dr. Kenneth Ehlen, DVM, owns a brokerage firm specializing in the sale and appraisal of veterinary practices. Dr. Ehlen practiced as a veterinarian for thirty years and began working in sales and appraisals after retiring from practice. At the time of trial, Dr. Ehlen had been in the business of veterinary sales and appraisals for thirteen years. Husband hired Dr. Ehlen in 2010 to appraise EAH because Husband planned to sell 49% of his practice to his associate, Dr. Matt Silvius. To determine the fair market value (FMV) of EAH, Dr. Ehlen spoke with Husband, reviewed three years of EAH's tax returns (as well as all other relevant financial statements), and visited the practice in August 2010.

In his report, dated August 31, 2010, Dr. Ehlen concluded that the gross earning value of EAH was $1,300,000. After subtracting long-term liabilities, he determined that the FMV of EAH was $1,068,000. This value did not factor in the accounts receivable or accounts payable, as those are considered only at the time of a sale. Dr. Ehlen acknowledged that the accounts payable could lower the value of a business asset. At trial, Dr. Ehlen noted that his valuation was "some-

---

1. "We view the evidence and all permissible inferences in the light most favorable to the judgment and disregard all contrary evidence and inferences." *Querry v. Querry*, 382 S.W.3d 922, 926 (Mo.App. W.D.2012).

2. Wife's appeal does not challenge any of the trial court's findings related to child custody or child support.

3. As of September 2012, the parties owed $35,748.79 in principal on the home mortgage (leaving a net value of $168,252), and they owed $126,248.22 in principal on the commercial property mortgage (leaving a net value of $823,752).

what dated" and that it should be updated in order to effectuate an actual sale. However, Dr. Ehlen also indicated that EAH was a "very good business," and he did not anticipate a dramatic upward or downward change to the valuation.

There was a proposed stock-purchase agreement between Husband and Dr. Silvius, dated March 2011—the date by which they hoped to complete the sale. The agreed-upon value of EAH for the purposes of the sale was $1,068,000. The sale was not finalized, however, because Wife obtained a court order staying the sale during the divorce litigation. Despite the delay, Husband testified that Dr. Silvius was ready and willing to purchase 49% of the practice and noted specifically that Dr. Silvius was "chomping at the bit." Husband's desire to sell 49% of his practice to Dr. Silvius centered on two main objectives: (1) Husband believed Dr. Silvius was a "stellar veterinarian" whose skills Husband did not want to compete against in the market; and (2) Husband needed to liquidate the business in order to pay Wife her share of its value (Husband assumed that Wife would be awarded one-half the value of EAH in the pending divorce).

Dr. David Davenport, DVM, who was retained as an expert witness by Wife, practiced as a veterinarian for over forty years and became involved in the business of veterinary practice brokerage and valuation in 2007. Dr. Davenport was retained on September 27 or 28, 2012, to review various financial documents, including Dr. Ehlen's report. Dr. Davenport agreed with Dr. Ehlen's projected gross earning value of $1,300,000. However, he testified that, after factoring in a decrease in existing long-term liabilities and new (unidentified) long-term liabilities, the current FMV was $1,212,000.

John Corbin, a certified public accountant (CPA), testified as Husband's rebuttal witness. Corbin was initially retained by Wife's attorney to review Dr. Ehlen's appraisal report.[4] Corbin did not interview Husband or prepare his own appraisal of EAH. Corbin analyzed Dr. Ehlen's work and testified that he was not providing his opinion regarding FMV at the trial; rather, he offered his opinion that Dr. Ehlen's 2010 valuation of EAH ($1,068,000) was reasonable, if not high.

Buddy L. Vick, CPA, also testified for Husband and indicated that, starting in 2003, he began preparing Husband and Wife's personal tax returns as well as the tax returns for EAH. In preparation for trial, Vick calculated Husband's projected income, taking into account the proposed sale of 49% of EAH to Dr. Silvius. In this calculation, Vick noted that, in the past, EAH had not paid regular monthly rent to Sparks, LLC, for the use of the commercial building and that, after the sale to Dr. Silvius was completed, rent would be paid annually in the amount of approximately $85,000. Additionally, Vick noted that the proposed sale anticipated monthly payroll bonuses given to Dr. Silvius in an amount equal to the monthly payments he would then pay Husband to effectuate the purchase of 49% of EAH.[5] After taking the

---

4. Wife's attorney at the time of trial was not the same attorney who first represented her in the divorce proceeding.

5. Dr. Silvius would receive a monthly bonus of $4,361 from EAH. Dr. Silvius would then make 120 monthly installment payments of $4,361 to Husband as payment for 49% of the shares of EAH. Thus, over ten years, Dr. Silvi-

us would pay Husband $523,320, or 49% of the $1,068,000 valuation of EAH. Vick explained that this business arrangement is beneficial for Husband, even though he, as the current owner of EAH, is financing Dr. Silvius's purchase with bonus payments from EAH, because, in this type of business, it is better to have more than one owner. He noted further that Dr. Silvius is investing

proposed sale into account, Vick concluded that Husband's projected income for 2012 was $159,828.

In rebuttal to Vick's testimony, Stan Stark, CPA, testified over Husband's objection. Wife retained Stark two days before he testified.[6] Stark essentially disagreed with Vick's projected income of $159,828 because the projection did not account for Husband's receipt of annual rental income in the amount of $85,000 if he were awarded Sparks, LLC. Stark opined that Husband's projected annual income was $266,000. In preparation for his testimony, Stark reviewed Husband's 2011 tax return, Exhibit 8 (Dr. Ehlen's adjusted gross income projection for 2012), and Exhibit P (an exhibit not prepared by any testifying witness). Stark did not speak with Husband about EAH, did not visit EAH, and was unaware of any expense obligations of Sparks, LLC. Stark also failed to consider that, if EAH was paying rent to Sparks, LLC, 51% of each rental payment would be paid by Husband as 51% owner of EAH.

Husband's rebuttal witness, Corbin, also testified about Husband's projected income. Corbin explained that it would be inappropriate to impute any income to Husband above a normalized compensation[7] because, if a higher income were imputed without any adjustment to the estimated value of EAH, then the value of the business would be counted twice. Corbin explained that the higher Husband's normalized income was, the lower the value of EAH would be, because all of the profit used to determine the FMV of EAH would instead be going toward Husband's higher income. After analyzing Dr. Ehlen's projected income report, Corbin concluded that Husband's normalized annual income would be approximately $100,000. Corbin also noted that he "didn't do any research of veterinary doctors' salaries, ... but [$100,000] didn't strike [him] as unreasonable."

Wife works twenty hours per week making $20 per hour. Her gross monthly salary is $1,883. Husband did not dispute the amount of Wife's income.

After Husband and Wife separated, she stayed in the marital home, and he moved to a substantially smaller rental home. Husband did not indicate what he paid in monthly rent. Starting at the time of the separation and continuing to the date of trial, Husband deposited a net amount of $6,200 per month into a joint account to support Wife and children.[8]

At trial, Wife testified that her monthly expenses were $10,013, including expenses for all three children. In a document Husband received from Wife's former attorney, however, Wife indicated that her monthly expenses were only $6,200. Wife testified that, because Husband's monthly deposits supported her and the children during the separation, she was able to save two-thirds of her monthly salary. Wife also noted that an expense of $1,075, for a new heating and cooling unit, was tempo-

---

sweat equity and future cash, and that Husband, through the sale, is "making an investment in the preservation of the future of his business."

6. Husband raised a continuing objection to Stark's testimony in the case due to untimely notice. The trial court overruled the objection at the time but noted that it would "revisit it at a later time if necessary."

7. Corbin explained that "normalized income" is the fair market value of Husband's work for EAH, because an owner can choose to pay himself any amount.

8. After a thorough review of the record, it appears that Husband did not submit an income and expense statement. Wife did submit an income and expense statement, and it is part of the record on appeal.

rary for the next eight months. Additionally, she indicated that the mortgage on the marital home ($1,500 each month) would be paid in full in thirty months.

## Dissolution Decree

### Division of Assets

The court, noting the parties' disagreement as to the value of EAH, credited Dr. Ehlen's report and testimony and found the FMV to be $1,068,000. The trial court found Dr. Davenport's testimony not credible, noting that he was retained as an expert shortly before the trial, he had a "limited time within which to complete an analysis and develop an opinion regarding the valuation of [EAH]," and no reports or curriculum vitae were submitted to the court to support his testimony. The trial court indicated that "Dr. Davenport's testimony was largely based on the calculations completed by Dr. Ehlen[,] and Dr. Davenport's testimony was essentially a different interpretation of the valuation report provided by Dr. Ehlen."

The trial court also credited Husband's testimony that a partial sale of the business was necessary to facilitate an equal property distribution and found that, although the value of EAH and the commercial property was substantial, "the cash flow of the business [is] not sufficient to pay [Wife] a lump sum to equalize the property distribution." The court's findings also noted that a sale of EAH was pending before the divorce and that it was stayed during the pendency of the litigation because of Wife's motion and subsequent court order.

The trial court awarded Husband EAH and Sparks, LLC, and assigned Husband all debt on the commercial property, the sole asset of Sparks, LLC. The court awarded Wife the marital home and all retirement accounts. To equalize the property division, the court ordered an equalization payment of $734,650, payable by Husband to Wife in installments over the next 120 months (ten years), at an interest rate of 4%.[9]

The trial court found shares of BP stock, valued at approximately $4,712, to be Husband's nonmarital property. In this finding, the court noted that although Wife's name was added to the shares after the stock was gifted to Husband, it was nonmarital property because no marital funds were expended to enhance the value of the stock, and Husband testified that he "did not know why the stock was held jointly."

### Income

The trial court determined that Husband's annual income would be affected by his need to sell 49% of his business. The court also acknowledged that each party presented expert testimony on the issue of Husband's income. In the judgment, the trial court overruled Husband's continuing objection to Stark's testimony. In its credibility assessment, the court noted that Stark was retained two days before the second day of trial and that Stark not only did not make the calculations set forth in Exhibit P (the exhibit that purportedly supported his testimony) but also failed to provide any explanation as to who made the calculations or on what information they were based. The trial court then found that Exhibit P was inadmissible hearsay and that Stark's testimony was not credible. In finding Vick credible, the court noted Vick's experience working with Husband and EAH. The court also discussed Corbin's testimony that Husband's income should be normalized to avoid double counting the value of EAH. After considering all of the evidence, the trial court

9. The parties were also awarded various bank accounts as well as personal and household items, none of which are the focus of this appeal.

found, consistent with Vick's testimony, that Husband's income was $159,828.

### Maintenance

In determining Wife's need for maintenance, the trial court noted that Wife would be receiving monthly interest income from the equalization payment in the amount of $1,316, and that her monthly income through part-time employment was $1,883. The court also found that Wife had "the ability to work full time but does not choose to do so." The court awarded Wife $100 in modifiable monthly maintenance.

Wife filed a Motion for Reconsideration of the Evidence and Amending Judgment. The court denied Wife's motion, and she now appeals.

### Standard of Review

"We will affirm the [trial] court's judgment unless it is unsupported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law." *Querry v. Querry*, 382 S.W.3d 922, 925–26 (Mo.App. W.D.2012). "We view the evidence and all permissible inferences in the light most favorable to the judgment and disregard all contrary evidence and inferences." *Id.* at 926. Moreover, we afford great deference to the trial court in dissolution cases, "because we recognize its superior position to assess witness credibility, sincerity, character, and other intangibles that may not be discernible from the record." *Id.; see also White v. Dir. of Revenue*, 321 S.W.3d 298, 308 (Mo. banc 2010) ("When evidence is contested by disputing a fact in any manner, this Court defers to the trial court's determination of credibility."). The trial court is free to believe all, some, or none of the evidence presented. *White*, 321 S.W.3d at 308. We do not reevaluate the testimony; instead, we are confined "to determining whether substantial evidence exists to support the trial court's judgment." *Id.* at 309. Determining whether a judgment is against the weight of the evidence is a process of examining its "probative value and not the quantity of evidence." *Id.* We will set aside a judgment as against the weight of the evidence only if we have a firm belief that it is wrong. *Short v. Short*, 356 S.W.3d 235, 240 (Mo. App. E.D.2011). In addition, our "primary concern is the correctness of the trial court result, not the route taken to reach it." *In re Riverside–Quindaro Bend Levee Dist. v. Mo. Am. Water Co.*, 117 S.W.3d 140, 146 (Mo.App. W.D.2003). Therefore, "[n]otwithstanding the fact that the trial court's judgment contains wrong or insufficient proffered reasons, if the correct result was reached, the appellate court must affirm." *Id.*

### Analysis

Wife raises nine points of error on appeal. She claims that the trial court erred in: (1) "disallowing" the testimony of one of her witnesses (Points II and III); (2) allowing the testimony of Husband's rebuttal witness (Point IV); (3) determining the valuation and division of certain marital assets (Points I and VI); (4) assessing a 4% interest rate on the equalization payment (Point V); (5) reducing the equalization payment by one-half of the applicable capital gains tax (Point VIII); (6) finding that jointly held British Petroleum (BP) stock was Husband's nonmarital property (Point IX); and (7) awarding monthly maintenance of $100 (Point VII). For the ease of discussion, we review the points out of order.

**A. Wife's appeal is not barred by her acceptance of the equalization payments.**

Before we examine the merits of Wife's claims, we must address Husband's argument that Wife is barred from appealing

the judgment because she has voluntarily accepted the benefits of the judgment by depositing the monthly equalization payments since January 1, 2013, when they first became due. Although we have no proof that she has accepted the payments, we will assume, for the sake of argument, that she has.

 The "general rule [is] that a party who voluntarily accepts the benefits of a judgment may not then prosecute an appeal to reverse it." *Selby v. Selby*, 149 S.W.3d 472, 480 (Mo.App. W.D.2004). In other words, "[a] party does not have the right to 'enjoy the fruits of a judgment' and to attack it on appeal." *Id.* (quoting *McIntosh v. McIntosh*, 41 S.W.3d 60, 65 (Mo.App. W.D.2001)); *see also George v. George*, 991 S.W.2d 679, 680–81 (Mo.App. S.D.1999) (noting that " 'the right to proceed on a judgment and enjoy its fruits, and to attack it on appeal, are totally inconsistent positions' " (quoting *In re Marriage of E.A.W.*, 573 S.W.2d 689, 691 (Mo.App.1978))). Although Husband correctly points out this general rule, he has wholly failed to acknowledge that exceptions may exist, and it is within this court's discretion whether to apply the rule in a given case. *Hicks v. Hicks*, 859 S.W.2d 842, 845 (Mo.App. W.D.1993).

 Whether the general rule should apply is determined on a case-by-case basis after considering all relevant circumstances. *Id.* In this determination, we consider several factors, including whether:

> (1) the amount received was a small portion of the total judgment; (2) the amount accepted has effectively been conceded to be due by a husband who did not appeal; (3) the acceptance of the benefits was due to financial distress; (4) [there is an] absence of prejudice to the judgment debtor husband; and (5)

... the only issue on appeal is whether an award will be increased.

*Id.* Moreover, " 'the general rule pertaining to acquiescence in judgments should not be strictly applied in divorce cases because of the peculiar situations of the parties and the equitable considerations involved.' " *McKee v. McKee*, 940 S.W.2d 946, 947 (Mo.App. S.D.1997) (quoting *Smith v. Smith*, 702 S.W.2d 505, 507 (Mo. App. S.D.1985)).

 Wife filed her notice of appeal on January 14, 2013. Each monthly installment of the equalization payment is $7,438 (representing 1/120 of the $734,650 total payment, including 4% interest). By that time, Wife presumably had received one payment from Husband, which was but a small portion of the total amount she was to receive over the next ten years. Additionally, Husband did not file an appeal from the divorce decree, and he concedes that Wife is entitled to an equitable share of the marital assets. Husband also does not contest that Wife's monthly expenses exceed her current income of $1,833. Thus, we find that Wife's acceptance of the judgment benefits, beginning on January 1, 2013, does not bar her from appealing the case to this Court.

### B. Witness Testimony (Points II, III, and IV)

### Wife's Expert Witness (Points II and III)

Wife argues that the trial court erred in *disallowing* the testimony of her expert, Stanley Stark, based on hearsay because the trial court's decision was "contrary to law" in that no hearsay objection was made and, thus, any objection on this basis was waived (Point II). Alternatively, she argues that the trial court abused its discretion in *disallowing* Stark's testimony based on hearsay "in that the judgment was unsupported by substantial evidence or was against the weight of the evidence"

(Point III). Relying on *Scott v. Blue Springs Ford Sales, Inc.*, 215 S.W.3d 145, 176 (Mo.App. W.D.2006),[10] Wife seeks a remand for the trial court to determine whether Stark's testimony was admissible, and, if (on remand) it is deemed reasonably reliable under the *Scott* test, Wife asks us to direct the court to reconsider the evidence. Both claims of error fail, however, because the trial court did not exclude Stark's testimony; rather, it simply discredited it.

In its judgment, the trial court specifically noted: "After being certified as an expert witness, Mr. Stark testified that he was retained to testify about [Husband's] projected income and that [he] was retained on Monday, October 8, 2012, two days prior to the second day of trial." Husband objected to the untimely disclosure and argued that both Stark's testimony and his exhibit should be excluded on this basis. The trial court reserved final ruling on Husband's objection and treated it as continuing. In its final judgment, the trial court overruled Husband's objection and assessed Stark's credibility as well as the weight to be given to his testimony. As to Stark's reliance on Exhibit P for determining Husband's projected income, the court noted that Stark "admitted that he, himself, did not make the calculations set forth in Exhibit P and gave no explanation as to who made the income calculations and upon what information the calculations were based." The trial court then excluded Exhibit P as inadmissible hearsay but still evaluated Stark's testimony and simply found it not credible.

Thus, contrary to Wife's assertion in Points II and III that Stark's testimony was disallowed on the ground of hearsay, Stark's testimony was admitted; it was simply discredited. The only evidence pertaining to Stark that was excluded was Exhibit P because it consisted of inadmissible hearsay. Wife's points on appeal, however, do not challenge the trial court's ruling as to the exhibit; rather, she challenges only the alleged exclusion of Stark's testimony. We are confined to reviewing the arguments raised in an appellant's points on appeal. Rule 84.04(e).[11]

Even if we liberally construed Wife's points on appeal to include a claim that the trial court erred in finding that Stark's testimony lacked credibility, she would not be entitled to relief in light of the fact that we afford great deference to a trial court's credibility determinations. *Querry*, 382 S.W.3d at 926; *In re Marriage of Kirkham*, 975 S.W.2d 500, 506 (Mo.App. S.D.1998) ("Any conflicts in testi-

---

**10.** In *Scott,* we held that a trial court has two mandates when determining whether an expert's opinion testimony satisfies the foundation requirements of section 490.065.3: "(1) to 'determine whether the facts and data are reasonably relied upon by experts in the particular field'; and (2) to 'ensure that the facts and data are otherwise reasonably reliable.' " 215 S.W.3d at 176 (quoting *Goddard v. State,* 144 S.W.3d 848, 854 (Mo.App. S.D.2004)). Thus, *Scott* addressed the foundation for admission of expert testimony.

**11.** For the first time in her reply brief, Wife asks that we remand "for reconsideration of the evidence *including Exhibit P.*" She argues that no hearsay objection was made as to Exhibit P and that the exhibit "was not 'inadmissible' because it was plainly admitted." Wife's argument in her reply brief is beyond the scope of her second and third points relied on. Rule 84.04(e). Further, " '[a] reply brief is to be used only to reply to arguments raised by respondents, not to raise new arguments on appeal.' " *Arch Ins. Co. v. Progressive Cas. Ins. Co.,* 294 S.W.3d 520, 524 n. 5 (Mo.App. W.D.2009) (quoting *Kells v. Mo. Mountain Props., Inc.,* 247 S.W.3d 79, 85 n. 7 (Mo.App. S.D.2008)). " '[W]e do not review an assignment of error made for the first time in the reply brief.' " *Id.* (quoting *66, Inc. v. Crestwood Commons Redevelopment Corp.,* 130 S.W.3d 573, 584 (Mo.App. E.D.2003)).

mony are for the trial court to resolve, and issues concerning credibility of witnesses are not eligible for appellate review.").

Points II and III are denied.

### Husband's Rebuttal Witness (Point IV)

██ Wife argues that the trial court erred in allowing John Corbin to testify, over her objection, as Husband's rebuttal witness because Corbin's status as Wife's *consulting* expert—rather than a *testifying* expert—rendered his opinions, impressions, and advice inadmissible on the ground that they were privileged work product. Wife claims that the admissibility of a consulting expert's testimony by the opposing party is a question of first impression in Missouri. She urges us to conclude that, just as an opposing party is precluded from obtaining pre-trial discovery regarding the other party's non-testifying, consulting expert witnesses, the opposing party should likewise be precluded from calling the other party's non-testifying, consulting expert as a witness at trial.[12]

Wife's point on appeal and initial argument to this Court turned on her characterization of Corbin as her *consulting* expert. At trial, Wife objected to Corbin's testimony based on his alleged status as a consulting expert, but she made no offer of proof and failed to provide any evidence to support her assertion that Corbin was a consulting expert only. And the factual basis for Wife's objection was qualified, at best. Before Corbin's testimony, Wife's counsel made the following objection:

Your Honor, as a preliminary matter, I would like to ask if—I don't remember [Wife's former attorney]—I know *I* have never designated Mr. Corbin as [Wife's] expert at trial, and therefore, I don't believe that we would agree to his admissibility at this time. Attorney work product and attorney-client privilege would apply to Mr. Corbin because he has been consulted with by [Wife's former attorney] previously and he was never designated for trial *that I know of.* If . . . [Husband's attorney] can correct me as to that, then I will be so corrected.

(Emphasis added.) The court overruled Wife's objection and allowed Corbin to testify. Wife made no attempt, during the trial, to withdraw any previous designation of Corbin as a testifying expert, and she made no argument that her decision not to call Corbin operated as a withdrawal of any previous designation. Thus, Wife's *only* argument to the trial court was that Corbin was not designated as a testifying expert and, thus, he was merely a consulting expert whose testimony was both privileged and inadmissible.

Despite her prior representations, Wife concedes in her reply brief that Corbin was, in fact, designated as a testifying expert by her former attorney. After making this concession, Wife put forward a *new* argument as to why Corbin's testimony should have been deemed inadmissible. Wife asserted that, because Corbin's opinion had not yet been disclosed through discovery, his designation as an expert witness could still have been withdrawn.

---

**12.** Wife is correct that the Missouri Rules of Civil Procedure do not require a party to identify non-testifying experts (i.e., consulting experts) during discovery; it requires identification of retained and non-retained *testifying* experts only. Rule 56.01(b)(4)-(5); *see also State ex rel. Richardson v. Randall,* 660 S.W.2d 699, 701 (Mo. banc 1983) ("[I]n a civil case[,] a litigant is not required to reveal the name of experts it does not intend to call."). "[F]acts known and opinions held by an expert are, until the expert is designated for trial, the work product of the attorney retaining the expert." *State ex rel. Tracy v. Dandurand,* 30 S.W.3d 831, 834 (Mo. banc 2000).

Wife's reply brief implied that, because she did not consent to Corbin being called as a witness, his expert designation was effectively withdrawn. Similarly, at oral argument, Wife argued that, because she did not consent to Husband calling Corbin as a witness at trial, and because Corbin's opinion had not previously been disclosed, she effectively withdrew any prior designation of Corbin as a testifying expert witness.

■■■ As noted above, the *only* objection Wife articulated at trial was that Corbin was *never* designated as a testifying expert but was a *consulting* expert only, and, as such, his opinion was privileged work product and his testimony was inadmissible. At trial, unlike on appeal, Wife never acknowledged that Corbin was designated as a testifying expert, nor did she argue that because his opinion had not been disclosed during discovery and she chose not to call him as a witness, the designation was effectively withdrawn. We will not convict a trial court of error for an issue not presented for its determination. *FH Partners, LLC v. Complete Home Concepts, Inc.*, 378 S.W.3d 387, 399 n. 7 (Mo.App. W.D.2012) (noting that arguments raised for the first time on appeal that were not presented to the trial court are not preserved for review). Moreover, even if the issue of an effective withdrawal of a designated expert had been presented to the trial court, it was not included in Wife's point relied on, and we are limited to reviewing only those arguments properly raised in an appellant's brief. Rule 84.04(e). We will not address issues raised for the first time in a reply brief. *Arch Ins. Co. v. Progressive Cas. Ins. Co.*, 294 S.W.3d 520, 524 n. 5 (Mo.App. W.D.2009).

■■■ Additionally, Corbin's testimony was cumulative; thus, any error in its admission was harmless. *See Doynov v. Doynov*, 149 S.W.3d 917, 926 (Mo.App. W.D.2004) (finding that evidence was cu-

mulative and noting that, "'the admission of improper evidence is not ordinarily a ground for reversal in a [court-tried] case, at least where it did not appear to have played a critical role in the court's decision'" (quoting *Gardner v. Robinson*, 759 S.W.2d 867, 868 (Mo.App. S.D.1988))). For the admission of improper evidence to constitute reversible error, a party "'must demonstrate that there was an absence of sufficient competent evidence to support' the trial court's judgment." *Id.* (quoting *Gardner*, 759 S.W.2d at 868). Our "'primary concern is with the correctness of the trial court's decision and not the route by which it was reached.'" *Id.* (quoting *Gardner*, 759 S.W.2d at 868).

Although Corbin provided some testimony regarding the value of EAH, the trial court discussed Corbin's testimony only in the context of Husband's *projected income*. Therefore, we can infer that the trial court did not rely on Corbin's testimony at all in determining the value of EAH. In discussing Husband's income, the trial court noted that both Corbin and Vick testified that Husband's income should be "normalized." But the trial court did not rely on Corbin's conclusion that Husband's normalized income was between $100,000 and $125,000; rather, the trial court found Husband's projected income to be $159,828, the amount provided by Vick. Thus, to the extent the trial court relied on Corbin's testimony, it was cumulative. Additionally, there was substantial competent evidence, aside from Corbin's testimony, to support the trial court's finding of Husband's projected income.

Point IV is denied.

### C. Valuation of EAH (Point I)

■■■ Wife argues that the trial court erred *as a matter of law* in valuing EAH at $1,068,000 based on the testimony of Husband's expert, Dr. Ehlen, in that Dr.

Ehlen's valuation predated the trial by twenty-six months.[13] She asserts that the value of marital property must be determined as of the date of trial, and the trial court therefore "misapplied the law" in relying on a two-year-old valuation. We disagree.

■■■ While "the date of valuation of marital property is the date of trial," *Wood v. Wood,* 361 S.W.3d 36, 39 (Mo.App. E.D. 2011), this does not mean that there is an artificial cut-off date beyond which a previously prepared valuation of the property becomes legally stale. *See, e.g., Held v. Held,* 896 S.W.2d 709, 711–12 (Mo.App. E.D.1995) (affirming a trial court's finding of real estate value based upon a sale of the marital home that occurred twenty-eight months before the date of trial). Rather, the trial court may determine the weight afforded to a valuation opinion predating the trial based on the facts and circumstances of the case. Thus, Wife incorrectly asserts that the valuation of EAH is purely a question of law subject to de novo review. Property valuation "is a *determination of fact* by the trial court, to which we give great deference, [and n]o one formula or method of determining value is binding or conclusive." *Thill v. Thill,* 26 S.W.3d 199, 203 (Mo.App. W.D.2000) (emphasis added); *see also D.K.H. v. L.R.G.,* 102 S.W.3d 93, 96 (Mo.App. W.D. 2003) ("The court has broad discretion in . . . valuing marital property. . . ."). Nonetheless, we recognize that, although the trial court has broad discretion, it "is 'prohibited from entering a valuation of marital property not supported by the evidence at trial.'" *Nelson v. Nelson,* 195 S.W.3d 502, 507 (Mo.App. W.D.2006) (quoting *Sullivan v. Sullivan,* 159 S.W.3d 529, 535 (Mo.App. W.D.2005)). Thus, the ap-

propriate question here is whether, under the facts of this case, Dr. Ehlen's valuation provided a sufficient evidentiary basis for valuing EAH at $1,068,000.

■■■ "[I]n a dissolution proceeding, the object of a business valuation is to determine [FMV] for the purpose of application of the equitable distribution rules to arrive at a fair property division." *Wood,* 361 S.W.3d at 38. "'[FMV]' is the 'price [that] the property in question would bring when offered for sale by one willing, but not obliged to sell it, and it is bought by one willing to purchase it, but who is not compelled to do so.'" *Nelson,* 195 S.W.3d at 507 (quoting *Shelby v. Shelby,* 130 S.W.3d 674, 684 (Mo.App. S.D.2004)). To establish the value of a business, a court generally attempts to determine what the business would be worth *if* it were sold to a willing buyer. Here, the value determined by Dr. Ehlen was the value used to establish the agreed-upon sale price of 49% of Husband's veterinary practice to Dr. Silvius. Thus, speculation on the issue of valuation was not required.

In 2011, Dr. Silvius agreed to purchase 49% of EAH for $523,320, based on the agreed-upon sale value of $1,068,000 as determined by Dr. Ehlen's appraisal. Although the proposed sale agreement was not finalized and the sale itself was not completed at the time of trial (because Wife obtained a court order preventing the sale during the pendency of the divorce litigation), there was evidence that Dr. Silvius agreed to the $1,068,000 valuation for the purposes of the sale and was ready and willing to proceed at the time of trial. Valuation of a closely held corporation can be a difficult matter. *Wood,* 361 S.W.3d at 38. Moreover, EAH is a small veterinary

13. Dr. Ehlen's report is dated August 31, 2010, and the trial was held in early October 2012.

practice and, therefore, when presented with the need to sell half of the business to facilitate a division of marital assets, Husband logically negotiated a sale to his current associate. In this case, the valuation underlying the negotiated sale price of EAH was substantial evidence of the business's FMV, despite the delay between the date of the valuation report and the dissolution trial.

Further, while a significant time lapse between the date of valuation and the date of trial may limit the evidentiary value of the suggested FMV, this generally occurs only when the value of the asset is volatile in nature. *McCallum v. McCallum*, 128 S.W.3d 62, 66–67 (Mo.App. E.D. 2003). Here, there is no evidence that the value of EAH was volatile. In fact, Dr. Ehlen testified that, given what he knew about EAH, he did not anticipate any dramatic change upward or downward from the August 2010 valuation amount of $1,068,000.

The real thrust of Wife's argument is that the trial court should have credited the valuation testimony of her expert, Dr. Davenport, over that of Dr. Ehlen. Generally, we defer to the trial court's determination of witness credibility. *White*, 321 S.W.3d at 308. Moreover, a trial court can accept the valuation opinion of one expert over another, "and can prefer one method of valuation over competing methods based on the particular facts of the case and the circumstances of the corporate entity involved." *Wood*, 361 S.W.3d at 40; *see also Nelson*, 195 S.W.3d at 507 (noting that a trial court is free to believe all, some, or none of any expert witness's testimony on valuation). In this case, two experts testified and provided conflicting valuations: one based on a dated valuation that was nevertheless supported by evidence of a ready and willing buyer and limited volatility in the asset's value, and the other based on testimony of an expert retained shortly before trial who, rather than perform his own valuation, merely critiqued the other expert's work.[14] " 'When the trial court's valuation of property is within the range of conflicting evidence of value offered at trial, the court acts within its discretion to resolve conflicts in evidence.' " *D.K.H.*, 102 S.W.3d at 97 (quoting *Taylor v. Taylor*, 25 S.W.3d 634, 644 (Mo.App. W.D.2000)).

Finally, Wife urges this Court to ignore the findings of the trial court and generate our own valuation of EAH by using numbers in the record to update Dr. Ehlen's valuation report. Wife's argument, however, ignores both our standard of review and the deference we give to the trial court's findings of fact and credibility determinations. *See Querry*, 382 S.W.3d at 926. We decline to conduct our own independent valuation of EAH.

In this case, the trial court had the best possible evidence of value, a proposed contract between a willing buyer and willing seller that established the value of the business. And, even if the contract for sale of the asset did not exist, because Dr. Ehlen's opinion provided substantial evidence of the value of EAH, the trial court would not have abused its discretion in determining the valuation of EAH by relying on Dr. Ehlen's testimony over Dr. Davenport's.

Point I is denied.

14. Wife's expert, Dr. Davenport, testified that his valuation experience included four valuations of businesses, "including this one." However, further testimony revealed that he did not complete his own valuation report for EAH. He reviewed Dr. Ehlen's valuation report and made adjustments to the long-term liabilities based on updated information provided by Husband.

## D. Division of Marital Assets (Point VI)

 Wife asserts that the parties had four substantial marital assets: (1) the marital home; (2) retirement accounts; (3) Sparks, LLC, which owned the commercial property it rented to EAH; and (4) EAH. Of these assets, Husband was awarded EAH (valued at $1,068,000) and Sparks, LLC (with a net value of approximately $824,000). Wife was awarded the marital home (with a net value of approximately $168,000) and the retirement accounts (valued at approximately $204,000). Additionally, Husband was ordered to pay Wife an equalization payment of $734,650 over a period of 120 months (ten years) at 4% interest.[15] Wife argues that the trial court erred in awarding substantially all of the revenue-producing marital assets to Husband. She claims that this division restricted her "to investing in [Husband's] veterinary practice [and] leaves [her] no alternative but to drastically alter her[ ] and her children's lifestyle, or . . . make ends meet by spending her portion of the marital property as it trickles in over the next ten years." Wife argues that a more just division would be for her to be awarded Sparks, LLC, and for her to collect the $85,000 in annual rent paid by EAH as the sole tenant of Sparks, LLC. We disagree.

 "The trial court has broad discretion in dividing mar[it]al property." *Thill,* 26 S.W.3d at 208. "The division of property need not be equal but must be fair and equitable under the circumstances of the case." *Moen v. Moen,* 140 S.W.3d 611, 613 (Mo.App. W.D.2004). We will find error in the trial court's distribution only when the property division "is so 'heavily and duly weighted in favor of one party as to amount to an abuse of discretion.'" *Thill,* 26 S.W.3d at 208–09 (quoting *Allen v. Allen,* 961 S.W.2d 891, 893 (Mo. App. W.D.1998)). "An abuse of discretion occurs only if the decree is so arbitrary or unreasonable that it indicates indifference and lack of proper judicial consideration." *Schubert v. Schubert,* 366 S.W.3d 55, 74 (Mo.App. E.D.2012). "The appellate court presumes that the trial court's division of marital property is correct, and the party opposing the division has the burden of overcoming this presumption." *Moen,* 140 S.W.3d at 613. Therefore, "[u]nless the judgment lacks substantial evidence to support it, or is against the clear weight of the evidence, we will sustain the trial court's finding." *Thill,* 26 S.W.3d at 209.

 In determining the equitable division of marital property, a "trial court must consider all relevant factors, including" the nonexclusive list found in section 452.330.1.[16] *Nelson,* 195 S.W.3d at 507.

---

15. In addition to EAH ($1,068,000) and Sparks, LLC ($823,752), Husband was awarded: a 2005 Ford Expedition ($2,885); all bank accounts held in his name alone, in the name of EAH, and in the name of Sparks, LLC ($7,000); and personal property ($1,050). In addition to the marital home ($168,252), all retirement accounts ($204,037) and the equalization payment ($734,650), Wife was awarded: a 2006 Ford Expedition ($6,695); all bank accounts in her name alone ($2,000); the joint bank account ($700); the joint money market account ($4,416); personal property ($25,228); and the National Golf Club Membership ($0). The marital property had a total value of $2,314,015, of which Husband received

$1,168,037, or 50.48% ($1,902,687 less the equalization payment of $734,650), and Wife received $1,145,978, or 49.52% ($411,328 plus the equalization payment of $734,650). Wife's total does not include the cash that she withdrew from the joint bank account since the separation—$13,450. At the end of the trial, the court indicated that it was going to try to divide the assets equally between the parties. From our calculation, it appears that the trial court succeeded.

16. The nonexclusive list of factors in section 452.330.1 includes:

 (1) The economic circumstances of each spouse at the time the division of property

" 'Section 452.330.1 gives the trial court great flexibility and far-reaching power to divide the marital property so as to accommodate the needs of the parties upon dissolution and there is no formula respecting the weight to be given [to] the relevant factors. . . .' " *Kirkham,* 975 S.W.2d at 507 (quoting *Waisblum v. Waisblum,* 968 S.W.2d 753, 756 (Mo.App. W.D.1998)). The joint purposes of the court's property division are to minimize the need for further litigation between the parties and to eliminate all joint property ownership. *In re Marriage of Accurso,* 234 S.W.3d 556, 557 (Mo.App. W.D.2007).

In *Accurso,* the wife was awarded title to a building in which the husband's law firm was located, making her his landlord. *Id.* In finding that this division did not serve the purpose of equitably dividing marital property, this Court noted that "[s]ection 452.330 mandates that the circuit court avoid placing the [parties] in a landlord-tenant relationship, if possible." *Id.* at 558. With the trial court's landlord-tenant arrangement, the parties were obligated "to interact significantly more than a different, yet equally equitable, property division would likely require." *Id.* In reversing and remanding the property division in *Accurso,* we noted that the record there failed to indicate that a landlord-tenant relationship was necessary under the circumstances, and the trial court's failure to further the purpose of section

452.330 was, therefore, an abuse of discretion. *Id.*

In the present case, the trial court divided the marital property in a manner that awarded nearly equal value to both parties. And, although Husband was awarded EAH, the clinic where he is a practicing veterinarian, and Sparks, LLC, the company that owns the commercial building where EAH is located, Wife was awarded a $734,650 equalization payment and other assets in order to make the division equitable under the circumstances. Wife argues that a more just division would have been for her to be granted sole ownership of Sparks, LLC, because it is an income-producing asset (receiving annual rent payments of $85,000 from EAH). Wife's suggested division, however, would create the very situation that *Accurso* held should be avoided whenever possible.[17] The property division here, including the equalization payment, is fair and equitable under the circumstances, and, as such, we find no abuse of discretion in Husband receiving EAH and Sparks, LLC, and Wife receiving her apportioned share of the marital assets in the form of an equalization payment.

Point VI is denied.

### E. Equalization Payment Interest Rate (Point V)

Husband was ordered to pay Wife an equalization payment of $734,650 over a period of ten years, plus interest at a rate

is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods of time to the spouse having custody of any children;
(2) The contribution of each spouse to the acquisition of the marital property, including the contribution of a spouse as a homemaker;
(3) The value of the nonmarital property set apart to each spouse;

(4) The conduct of the parties during the marriage; and
(5) Custodial arrangements for minor children.

17. That one party receives the income-producing asset does not necessarily make the division of marital property unfair or inequitable. That property is income producing may be a factor to be considered in establishing its value. But, in this case, Wife does not argue that Sparks, LLC, was undervalued.

of 4%. The monthly installment payments equal $7,438 ($6,122 in principal and $1,316 in interest).[18] Wife claims that the trial court erred as a matter of law in awarding a 4% interest rate on the equalization payments because section 408.040.1 mandates that the interest rate on all non-tort judgments be 9% per annum. We disagree.

There are two statutes at issue here.[19] On the one hand, section 408.040.1 provides:

> In all nontort actions, interest *shall be allowed* on all money due upon any judgment or order of any court from the date judgment is entered by the trial court until satisfaction be made by payment, accord or sale of property; all ... judgments and orders for money shall bear nine percent per annum until satisfaction made as aforesaid.

(Emphasis added.) Section 452.330.1, on the other hand, provides that a trial court has broad discretion in the division of marital property, stating "[i]n a proceeding for dissolution of the marriage ... the court shall ... divide the marital property ... in such proportions as the court deems just after considering all relevant factors."

The issue then is whether the broad discretion granted by section 452.330 allows a court to award interest in an amount less than the 9% otherwise mandated by section 408.040.1. All three districts of this Court have held that section 408.040.1 does not mandate an award of 9% interest on installment equalization payments. *Randall, Boxx & Masri, P.C. v. Norman*, 237 S.W.3d 634, 635 (Mo.App. S.D.2007) (noting that "irrespective of the provisions of [s]ection 408.040, ... whether to award or not award interest on a money judgment arising out of the division of

marital property before a payment becomes due is within the discretion of the trial court after it has considered all relevant factors"); *Corbett v. Corbett*, 728 S.W.2d 550, 555 (Mo.App. W.D.1987) ("[T]he question of interest [on a property equalization award] is left to the discretion of the trial court."); *In re the Marriage of W.E.F. v. C.J.F.*, 793 S.W.2d 446, 452–53 (Mo.App. E.D.1990) (recognizing "that there may be situations where failure to award interest may not constitute an abuse of trial court discretion" but finding that, here, "we see no reason why interest should not be paid").

In *Corbett*, we noted that, although section 408.040.1 "provides that interest shall be allowed on all money judgments [at a rate of 9% per annum,] ... [section] 452.330.1[ ] gives the court broad discretion to divide the marital property as it deems just after considering all relevant factors." 728 S.W.2d at 555. Accordingly, we found that, under the circumstances, the trial court did not abuse its discretion when it ordered an equalization payment payable in installments over two years without interest. *Id.*

Wife acknowledges our holding in *Corbett* but argues that it is wrongly decided. She asserts that, although section 452.330 does not require a trial court to award interest, section 408.040 "most certainly does" when an ordered equalization payment is payable in installments. She further asserts that the two statutes do not conflict because, even if a trial court is required to award 9% interest on installment equalization payments, the court "remains free to 'divide the marital property ... in such proportions as the court deems

**18.** The amount of principal paid may be reduced by one-half of the amount of capital gains taxes paid on the sale of shares of EAH. See section F, infra.

**19.** All statutory references are to the Revised Statutes of Missouri 2000, as updated through the 2012 Cumulative Supplement, unless otherwise noted.

just after considering all relevant factors.'" She then asserts that she is not taking the position that the mandatory 9% interest rate is a relevant factor or an economic circumstance of the parties that might be considered in the division of property. Rather, she argues that, if a court deems a 9% interest rate on an equalization payment to be excessive, the court can either elect a more even in-kind distribution of marital assets or a lump-sum equalization payment. In making this argument, however, Wife highlights the obvious conflict between the two statutes.

The purpose of section 452.330's grant of discretion is to allow a trial court to fashion an equitable distribution of marital assets. The courts of this state have consistently held that, to effect an equitable distribution, section 452.330 grants trial courts the discretion to award an equalization payment in lieu of the division of actual marital assets, *see, e.g., Corbett,* 728 S.W.2d at 555; *In re Marriage of Paul,* 704 S.W.2d 278, 279 (Mo.App. S.D.1986), and to award an equalization payment in installments if there are not sufficient liquid assets. *See, e.g., W.E.F.,* 793 S.W.2d at 453 (noting that installment payments may be warranted by the parties' economic circumstances, and finding that, "[h]ere, the lack of liquid assets justified the installment payments"). Yet, in the present case, Wife asks us to read section 408.040.1 as limiting a trial court's equitable authority in cases where a 9% interest rate might be excessive, so that the court must *either* award an excessive interest rate *or* award property in-kind or a lump-sum payment. This interpretation not only limits section 452.330's grant of discretion but also fails to further the purpose of section 408.040. *See Kansas City Power & Light Co. v. Bibb & Assocs., Inc.,* 197 S.W.3d 147, 160 (Mo.App. W.D.2006) (noting that the purpose of section 408.040 as it relates to post-judgment interest is "'to compensate a judgment creditor for the judgment debtor's delay in satisfying the judgment'" (quoting *Johnson v. BFI Waste Sys. of N. Am., Inc.,* 162 S.W.3d 127, 129 (Mo.App. E.D.2005))); *Green Acres Enter., Inc. v. Freeman,* 876 S.W.2d 636, 641 (Mo.App. W.D.1994) ("[P]ost-judgment interest is awarded on the theory that it is a penalty for delayed payment of the judgment.").

Here, where the trial court awarded installment payments, interest is not a penalty for delayed payment; it is simply part of the trial court's equitable division of marital assets. Additionally, it is important to note that section 408.040.1 mandates a 9% annual interest rate on "money *due* upon any judgment." (Emphasis added.) And, as the Southern District recognized in *Randall,* 237 S.W.3d at 635, when a trial court orders installment equalization payments (as it has the discretion to do), the later installment payments are not *due* at the time of the initial judgment entry; therefore, section 408.040.1 is literally inapplicable under these circumstances. Thus, we decline Wife's invitation to reconsider the holding of *Corbett.* Instead, we hold that, when dividing marital property, trial courts have the discretion to decide whether interest should be paid, and if so, in what amount.[20]

**20.** We note that absent a finding by the trial court to the contrary, 9% interest on installment equalization payments may be the default position. *See Paul,* 704 S.W.2d at 279 (finding that the trial court erred in not awarding interest, and noting that because an equalization payment was awarded in 144 installments, "interest based on that currently allowed for judgments, nine percent per annum, should have been awarded"); *W.E.F.,* 793 S.W.2d at 453 (finding that it was error for the trial court to award no interest in light of the amount of the equalization payment and the length of time over which it would be

Here, the trial court found that the installment payments are subject to a 4% interest rate. The interest paid is income to Wife. The trial court found this to be an equitable remedy after considering all the relevant factors related to property division in the present case. The trial court did not err in awarding less than 9% interest on the installment payments because, under section 452.330.1, a trial court has broad discretion in dividing marital property, 9% interest is not mandatory on equalization payments, and it was within the trial court's discretion to adjust the interest rate to accomplish an equitable distribution of marital assets.[21]

Point V is denied.

### F. Capital Gains Tax (Point VIII)

The trial court ordered Husband to pay the $734,650 equalization payment "less one-half of capital gains tax if applicable." Wife argues that the trial court abused its discretion in reducing the equalization payment by the amount of the applicable capital gains tax liability because such a reduction was not supported by substantial evidence and was against the weight of the evidence, and, consequently, the judgment was uncertain, indeterminate, and not reasonably calculated to avoid future litigation. We disagree.

Dr. Silvius was to purchase 49% of EAH. The sale of shares to Dr. Silvius was to be undertaken in order to create liquid assets so that Husband could pay Wife her share of EAH's value. Money received from the sale would then be used by Husband to pay Wife $4,361 per month; the portion of the equalization payment attributable to her share of EAH. Vick testified that Dr. Silvius's payments would be subject to capital gains tax, and that Husband, as the owner of EAH, would be liable for all of the assessed tax. Vick explained that, if Wife ultimately received the money from Dr. Silvius's payments as part of the equalization payment, it would be appropriate to assess a portion of the applicable capital gains tax to her. However, because the capital gains tax rate was subject to change, the actual amount of capital gains tax liability could not be determined at the time of trial.[22] Husband requested, and the trial court agreed, that the month-

paid, and amending the judgment to award 9% interest as currently allowed by section 408.040); *Smithson v. Smithson*, 986 S.W.2d 939, 942 (Mo.App. S.D.1999) (awarding interest pursuant to section 408.040 when the judgment did not award interest and circumstances of the case did not support awarding no interest); *see also Short*, 356 S.W.3d at 249 (rejecting husband's argument that a dissolution of marriage judgment does not bear interest unless the judgment specifies an amount of interest, and finding that there was no error where "Husband moved the trial court to include an express award of interest in its Judgment and the trial court declined to do so as unnecessary because [s]ection 408.040 provides for the award of interest in this case").

21. Any award of interest is part of the overall property distribution and will be reviewed for an abuse of discretion. Although, in her point relied on, Wife argues only that 9% interest is mandatory and that failure to award interest at that rate was error as a matter of law, in the argument portion of her brief she also argues that there was no evidence to support the award of 4% interest. Our review is limited, however, to those issues raised in an appellant's point relied on. Rule 84.04(e). The argument portion of Wife's brief also includes a lengthy discussion of why requiring Wife to finance Dr. Silvius's purchase of EAH, rather than requiring Husband or Dr. Silvius to obtain a commercial loan, is inequitable and contrary to public policy. This argument is clearly beyond Wife's point relied on and thus beyond our review.

22. At the time of trial, a significant debate was occurring before Congress as to potential changes to the capital gains tax, making a reasonable determination of the applicable tax in the future impossible.

ly equalization payments would be reduced by one-half of any applicable capital gains tax resulting from the sale of EAH shares so that Husband and Wife would share the capital gains tax liability equally and so that the net value of EAH would be accurately reflected in the equalization payment.

Wife asserts that neither party presented evidence of the cost basis in "any property" [23] and that, without this evidence, the trial court could not determine the actual amount of capital gains tax liability with sufficient specificity. Also, although she does not explain how, Wife alleges that Husband's business decisions may affect how and when capital gains tax liability accrues. Wife also alleges that, had Husband presented evidence of the cost basis in EAH, the trial court could have calculated capital gains tax liability at trial and deducted half of that amount from the equalization award at that time. The thrust of Wife's argument is two-fold: first, that there was insufficient evidence from which the trial court could have determined the amount of capital gains tax liability; and, second, that the party seeking an adjustment as a result of adverse tax consequences must present evidence from which the *amount* of the tax consequences can be determined, and since Husband did not meet this burden, the portion of the judgment addressing capital gains taxes should be struck.

 "[A] court must consider the tax consequences as a factor when dividing a marital asset." *Calhoun v. Calhoun*, 156 S.W.3d 410, 417 (Mo.App. S.D.2005). " 'The burden of showing adverse tax con-

sequences must be established with particularity at trial if they are to be considered on appeal.' " *Linton v. Linton*, 117 S.W.3d 198, 206 (Mo.App. S.D.2003) (quoting *Mika v. Mika*, 728 S.W.2d 280, 285 (Mo.App. E.D.1987)). Here, the evidence demonstrates that the sale of EAH will result in adverse tax consequences. In fact, both parties appear to agree that there will be adverse tax consequences; specifically, the imposition of capital gains tax on Husband.

 Although the law generally requires a money judgment to be definite and certain to be enforceable, "[t]he requirement of definiteness and certainty has been relaxed ... in the context of dissolution orders and decrees." *Pratt v. Ferber*, 335 S.W.3d 90, 94 (Mo.App. W.D. 2011). However, "a decree that fails to set forth any specific and certain criteria to determine the amount due is unenforceable." *Hoffman v. Hoffman*, 292 S.W.3d 436, 439 (Mo.App. E.D.2009). Therefore, there must be sufficient evidence in the record from which the trial court could establish the *criteria to determine* the amount due, but there need not be sufficient evidence from which the actual amount can be determined. This is particularly true where, as is the case here, the trial court is dividing the responsibility for any tax liability equally between the parties. If the tax liability was assigned to one party, and the property distribution adjusted accordingly, there would be greater need to establish the actual amount of the tax owed.

 It is the latter approach that Wife advocates. She alleges that, had Husband

---

**23.** Although the trial court's judgment does not specify the property it is referring to when reducing the equalization payment by the applicable capital gains tax liability, it is clear to this court that the judgment was referring to any capital gains taxes owed as a result of the sale of 49% of EAH to Dr. Silvius. Therefore, our discussion of capital gains taxes will address only taxes resulting from the sale of EAH. Additionally, we amend the trial court judgment to reflect that the applicable capital gains tax liability applies to the payments

presented evidence of EAH's cost basis, the trial court could have calculated the capital gains tax liability at the time of trial and deducted half of that predetermined amount from the equalization award. Had that been the relief Husband sought, he would have been obligated to present sufficient evidence to allow the calculation of the estimated capital gains tax liability. But that is neither the relief he sought nor the outcome the trial court found to be equitable. If Wife believed that a calculation at the time of trial would have been to her advantage, she could have presented evidence to allow for a calculation at that time. Wife acknowledges that her decision not to present evidence of EAH's cost basis to the trial court was a "conscious decision of trial strategy." A party who fails to meet its burden of showing adverse tax consequences is precluded from raising the issue as error on appeal. *Calhoun*, 156 S.W.3d at 417.[24]

■ We reject Wife's claim that Husband's failure to present evidence allowing the trial court to calculate the amount of capital gains tax liability rendered the judgment uncertain, indeterminate, and not reasonably calculated to avoid future litigation. Although the trial court's judgment contains few details as to how capital gains tax liability is to be offset against the monthly equalization payments, any resulting uncertainty is not due to a lack of evidence, as Wife suggests, but is, instead, an issue of the language used in the judgment.[25] And because Wife's post-trial motion did not allege any error as to the specific language in the judgment relating to the division of capital gains tax liability, that issue is not preserved for appeal. *See* Rule 78.07(c) ("[A]llegations of error relating to the ... language of the judgment ... must be raised in a motion to amend the judgment in order to be preserved for appellate review.").

Point VIII is denied.

### G. BP Stock (Point IX)

■ The trial court classified approximately $4,712 in BP stock as Husband's nonmarital property. Wife argues that this classification was erroneous because the stock was presumably marital property in that, although Husband received the stock as a gift, he later added Wife's name to the stock and failed to overcome the presumption that the transfer was *not* a gift. While we agree that the BP stock should have been classified as marital property, we find that Wife failed to show

---

related to the purchase of EAH. *See* Rule 84.14.

24. Wife also argues that the trial court should have established the amount of capital gains tax liability at the time of trial because she should not "share the burden of a future sale at a later date under an unknown tax law." Wife cites no authority supporting this assertion. Moreover, the trial court's decision to offset one-half of any capital gains tax liability against the monthly equalization payments appears to have been influenced, in part, by the evidence that the capital gains tax rate might change in the future. The stated goal of the trial court was to divide the marital assets as equally as possible. The sale of 49% of EAH was undertaken by Husband to pay Wife her share of the business's value, and ·

there was evidence that there were insufficient liquid assets to pay Wife her share of EAH without selling the shares. The sale would result in significant tax consequences in the form of capital gains tax liability, thus affecting the value of EAH. Because the capital gains tax rate might change, allowing a set-off against the equalization payment in the amount of capital gains taxes actually paid was a way of furthering the court's goal of an equal distribution.

25. We also note that the set-off for capital gains tax liability against the amount of the monthly equalization payment, and the resulting decrease in interest income, may affect maintenance. However, this does not render the judgment uncertain, as maintenance is modifiable.

that she was prejudiced by the misclassification.

Husband acquired an unspecified amount of BP stock from his grandmother approximately fifteen years before the divorce. Although the stock was initially a gift to him, alone, he added Wife's name to the shares at some point during the marriage. Husband testified that he was "not exactly sure why [Wife's name was added] other than in the event of [his] death it would make it much easier for her to acquire the money when we were married." Neither Husband nor Wife touched the stock during the marriage. At the time of the divorce, the stock had an estimated value of $4,712.

 Although the trial court's determination of property is guided by applicable statutes, the court retains " 'considerable discretion in [the] classification of property as marital or non-marital.' " *Bowman v. Prinster*, 384 S.W.3d 365, 372 (Mo. App. E.D.2012) (quoting *Glenn v. Glenn*, 345 S.W.3d 320, 326 (Mo.App. S.D.2011)). " 'An abuse of discretion occurs when a trial court's ruling is clearly against the logic of the circumstances then before [it] and is so arbitrary and unreasonable as to indicate indifference and a lack of careful judicial consideration.' " *Id.* (quoting *Glenn*, 345 S.W.3d at 326).

 "All property acquired by either spouse subsequent to the marriage and prior to a decree of ... dissolution of marriage is presumed to be marital property regardless of whether title is held individually" or jointly by the parties. § 452.330.3. This presumption can be overcome if a party demonstrates that the property was "acquired by gift, bequest, devise, or descent." *See* § 452.330.2(1). However, even if property was received as a gift by one spouse separately, the act of "[p]lacing separate property into the names of both spouses creates a presumption that the property has been transferred to the marriage 'and clear and convincing evidence is required to show that the transfer was not intended as a gift.' " *Blydenburg–Dixon v. Dixon*, 277 S.W.3d 815, 819 (Mo.App. W.D.2009) (quoting *In re Marriage of Tullier*, 989 S.W.2d 607, 612 (Mo.App. S.D.1999)); *see also D.K.H.*, 102 S.W.3d at 99 ("The presumption that non-marital property has been transmuted to marital property arises where a spouse's name has been added to the title."). " 'The clear and convincing evidence standard refers to evidence that instantly tilts the scales in the affirmative when weighed against the evidence in opposition, and the fact finder's mind is left with an abiding conviction that the evidence is true.' " *Farnsworth v. Farnsworth*, 108 S.W.3d 834, 839 (Mo.App. W.D.2003) (quoting *In re Marriage of Jennings*, 910 S.W.2d 760, 763 (Mo.App. S.D.1995)).

 Yet even if a party can demonstrate error in the trial court's classification of property, it " 'is not necessarily prejudicial ... unless it materially affects the merits of the action.' " *Id.* (quoting *Jennings*, 910 S.W.2d at 765). Thus, if the decree is fair despite a misclassification of property, reversal is not required. *Id.* Although transmutation may determine whether property is marital, " 'it does not determine the division of the property.' " *Id.* at 840 (quoting *Mellon v. Mellon*, 973 S.W.2d 570, 573 (Mo.App. W.D.1998)). Trial courts have broad discretion when dividing marital property, and the division "need not be equal but must be fair and equitable under the circumstances of the case." *Moen*, 140 S.W.3d at 613 (noting further that a reversal is warranted only "if the division is so unduly weighted in favor of one party as to constitute an abuse of discretion"). Moreover, an appellant must assert prejudice in the point relied on, and if she fails to do so, any such

claim of prejudice is deemed abandoned. *Farnsworth,* 108 S.W.3d at 840, n. 5.

Here, Wife's point on appeal asserts only that the trial court erred in awarding Husband the BP stock as his nonmarital property. Wife's point on appeal does not claim any prejudice from the misclassification. In her argument, Wife acknowledges the holding in *Farnsworth,* and then claims that the trial court's finding was unfair. Wife requests that this Court order the trial court to declare the BP stock marital and then divide it equally between the parties. Because Wife did not assert prejudice in her point relied on, she has abandoned this claim of error.

However, even if she had properly asserted prejudice and the BP stock had been reclassified as marital property, the trial court is not required to award any of it to Wife. In fact, because a trial court must consider the contribution of each spouse in the acquisition of marital property, § 452.330.1(2), it is quite likely that Husband would have been awarded all of the stock, as Wife conceded that it was initially a gift to him and neither party took any action to increase or decrease its value. Moreover, the value of the stock is less than 2% of the parties' total assets, which have a value of over $2 million, of which Wife was awarded nearly half. Thus, given the trial court's broad discretion in dividing marital property, we find that, even if the misclassification of BP stock had been properly asserted on appeal, Wife could not have demonstrated that she suffered any prejudice from this alleged misclassification and the court's failure to award her an additional $2,356.

Point IX is denied.

### H. Maintenance (Point VII)

■ Wife argues that the trial court erred in limiting her monthly maintenance award to $100. She claims that the award was an abuse of discretion because the record does not support the trial court's finding that Husband could not pay more than $100. In essence, Wife argues that because Husband could pay more, the trial court abused its discretion by not ordering him to do so. But Wife's focus on Husband's income is misplaced. The appropriate question for this court is whether the record supports the conclusion that Wife needed, at most, only a minimal amount of maintenance to close any gap that existed between her reasonable monthly needs and her ability to provide for those needs through the use of property or appropriate employment. Finding that the record supports the award of only nominal maintenance, we affirm.

■ The goal of a maintenance award is to close the gap between a spouse's income and his or her monthly expenses. *Tarneja v. Tarneja,* 164 S.W.3d 555, 564 (Mo.App. S.D.2005). "The trial court has broad discretion to award maintenance, and we review its decision only for abuse of discretion." *Voinescu v. Kinkade,* 270 S.W.3d 482, 488 (Mo.App. W.D. 2008). Moreover, " '[o]ur concern ... in reviewing a court-tried case is whether the trial court reached the proper result, not the route taken to reach that result.' " *Blydenburg–Dixon,* 277 S.W.3d at 821 (quoting *In re Marriage of Gerhard,* 985 S.W.2d 927, 932 (Mo.App. S.D.1999)). "We affirm if the result was correct 'on any rational basis.' " *Id.* (quoting *Heslop v. Heslop,* 967 S.W.2d 249, 255 (Mo.App. W.D.1998)).

■ Trial courts follow a two-step approach in maintenance determinations. Maintenance is awarded only when the court "finds that the spouse seeking maintenance: (1) Lacks sufficient property, including marital property apportioned to [her], to provide for [her] reasonable needs; and (2) Is unable to support [her-

]self through appropriate employment." § 452.335.1; *Tarneja,* 164 S.W.3d at 564. Therefore, "the trial court must first determine the reasonable needs of the party seeking maintenance." *Schubert,* 366 S.W.3d at 63. "After the court determines the party's reasonable needs, the court must then determine whether the party 'is able to provide for these needs through use of property or appropriate employment.'" *Id.* (quoting *D.K.H.,* 102 S.W.3d at 103). If the trial court determines that a spouse should be awarded maintenance under the two-step approach, it must then consider the factors found in section 452.335.2.[26]

Here, the trial court ordered Husband to pay $100 per month in modifiable maintenance. The Judgment notes that Wife will receive, on average, $1,316 a month in interest from husband on the $734,650 equalization payment; that she earns $1,883 a month from part-time employment; and that she is able to work full time, but has chosen not to do so. The trial court also noted that Husband's monthly equalization payment to Wife— $7,438—was "more than one-half of [his] monthly income exclusive of any of his living expenses or any other debt he must pay."

Wife's argument is three-fold. First, noting that the trial court did not find her to be an incredible witness, she argues that the trial court must have accepted her evidence that her monthly expenses are $10,013. Next, she argues that "[o]f necessity under the two[-]part test set forth [in *Tarneja*] because she was awarded maintenance, the [trial court] must have found [her] without sufficient property to provide for her own needs and unable to support herself through appropriate employment." Finally, she argues that the trial court overstated Husband's monthly debt obligation because $4,361 of the $7,438 Husband pays Wife each month reflects her share of the value of EAH, and the money to pay that portion of the monthly equalization payment comes from the bonus paid by EAH to Dr. Silvius, which is then paid by Dr. Silvius to Husband. Thus, she argues, only $2,979 of Husband's monthly equalization payment is paid to her out of Husband's salary,[27] and the implicit finding of the trial court, that Husband could not afford to pay more maintenance, was therefore erroneous. Based on her first two arguments, Wife assumes the trial court found a significant gap between her income and her

---

**26.** Section 452.335.2 provides that in calculating a maintenance award, the trial court must consider the following non-exclusive list of relevant factors:

(1) The financial resources of the party seeking maintenance, including marital property apportioned to [her], and [her] ability to meet [her] needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as a custodian;

(2) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;

(3) The comparative earning capacity of each spouse;

(4) The standard of living established during the marriage;

(5) The obligations and assets, including the marital property apportioned to [her] and the separate property of each party;

(6) The duration of the marriage;

(7) The age, and the physical and emotional condition of the spouse seeking maintenance;

(8) The ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance;

(9) The conduct of the parties during the marriage; and

(10) Any other relevant factors.

**27.** Husband also pays child support.

reasonable monthly expenses and that the trial court would have awarded her more maintenance but for its allegedly erroneous assumption that all of the monthly equalization payment was to be paid from Husband's estimated income of $159,000. Because we find that the record supports the rejection of Wife's first two arguments, we conclude that the trial court did not abuse its discretion in finding that there was only a de minimis gap between Wife's reasonable monthly expenses and her income. Therefore, we do not reach the issue of whether Husband could have afforded to pay more.

First, we reject Wife's argument that, because the trial court did not make a specific finding that her testimony was incredible, the court must have accepted her evidence that her monthly expenses were $10,013. Although the trial court's judgment did not include a specific finding related to Wife's expenses,[28] there was evidence in the record from which the trial court could have concluded that Wife's claim of $10,013 in expenses was not reasonable. *See Linton*, 117 S.W.3d at 205 (" 'The trial court has broad discretion in evaluating the merits of each party's expense claims.' " (quoting *Evans v. Evans*, 45 S.W.3d 523, 529–30 (Mo.App. W.D. 2001))). First, in her expense statement, Wife included at least $4,017 in costs related to the children, none of which should be considered by the trial court, because a maintenance request relates to the needs of the recipient only, and the needs of the children are considered in the child support determination.[29] *Schubert*, 366 S.W.3d at 64 (noting that maintenance awards are "limited to the needs of the

recipient[,]" and not the needs of the children).

In addition, there is evidence in the record that suggests Wife's claimed monthly expenses are overstated. During their separation, Husband paid Wife $6,200 each month to cover Wife's and children's expenses. Wife testified that while receiving the $6,200 each month, she was able to save two-thirds (approximately $1,262) of the monthly income she received from her part-time employment. This suggests that her monthly needs were less than $6,200, and significantly less than the $10,013 she now claims.

Further, Wife's expense statement includes items that the trial court could have found unreasonable (e.g., $350 per month for recreation). Moreover, the two largest monthly expenses identified on Wife's expense statement, the mortgage and the payment for a replacement heating and cooling system, were both temporary. The evidence indicated that the heating and cooling system ($1,075 monthly) was paid off in July 2013, and that the mortgage ($1,493 monthly) will be paid off in April 2015.

Thus, there is evidence in the record from which the trial court could have rejected Wife's claimed monthly expenses.

Additionally, there is evidence in the record that Wife was able to provide for most of her own needs through property and appropriate employment. The trial court's judgment noted that Wife will receive an average monthly interest payment

---

**28.** Wife did not request specific findings related to maintenance, nor are they statutorily required. Moreover, she has not raised the issue of insufficient findings in her point on appeal. "All fact issues upon which no specific findings are made shall be considered as

having been found in accordance with the result reached." Rule 73.01(c).

**29.** Husband was ordered to pay $1,354 each month in child support and this award was not challenged.

of $1,316 from Husband.[30] The trial court also noted that, although Wife works part time earning $1,883 a month, "she has the ability to work full time but does not choose to do so." These two findings support the conclusion that appropriate employment and interest on the equalization payment could provide Wife with an income of approximately $5,000 per month.

Furthermore, Wife was awarded a substantial amount of marital property, including all of the retirement accounts, the marital home, and the equalization payment of $734,650, payable over ten years. The total estimated value of her marital property award is $1,145,978. The monthly equalization payment of $7,438 consists of $1,316 in interest and $6,122 in principal. Although "[a] spouse is not required to deplete or consume his or her portion of the marital assets before being entitled to maintenance," the interest that spouse could earn from those assets must be considered by the trial court if maintenance is awarded. *Schubert*, 366 S.W.3d at 64–65. As Wife receives the monthly equalization payments, the principal portion of the payment can be invested and produce income. In addition, the $204,000 in retirement accounts may also produce income. *See Hill v. Hill*, 53 S.W.3d 114, 116 (Mo. banc 2001) (holding that, "when calculating maintenance, a trial court must consider the income from retirement and IRA accounts to be apportioned as marital property").

The fact that the trial court awarded Wife nominal maintenance supports the conclusion that the trial court found nothing more than a de minimis gap between Wife's income and her monthly expenses. The evidence suggests that there is little, if any, gap between Wife's income and her monthly expenses. Thus, the trial court did not abuse its discretion in awarding nominal, modifiable maintenance of $100 per month.

Point VII is denied.

## Conclusion

Wife's claims on appeal are not barred by her acceptance of Husband's equalization payments. The trial court did not exclude the testimony of Wife's expert, Stark, and did not err in overruling Wife's objection to the testimony of Husband's rebuttal witness. There was sufficient evidence to support the trial court's valuation of EAH, and the division of marital assets was equitable and fair under the circumstances. The trial court did not abuse its discretion in awarding 4% interest on the equalization payment, in ordering Husband to pay an equalization payment less one-half of the applicable capital gains tax, and in awarding $100 in modifiable monthly maintenance. And, even if we find that the trial court's classification of the BP stock as Husband's nonmarital property was in error, Wife is not entitled to relief because she failed to demonstrate any

---

30. Wife claims that a more accurate monthly interest amount for the purposes of this appeal is $2,450, based on an amortization of the interest on the equalization payment over ten years, rather than a simple interest calculation. The trial court, as explained in its judgment, took the total amount of interest to be paid over a period of ten years—$157,907—and divided that amount by 120, the total number of payments, to arrive at the monthly amount of $1,316. The trial court has equalized the amount of interest over the ten years, as opposed to using a strict amortization which would require Husband to pay more interest and less principal up front. We understand Wife's position, but we do not agree that it is a better option, because, if amortized, only the first month's interest payment would be $2,450. After that, the monthly interest income would continue to decrease over ten years. We do not find that the trial court's method of calculating the monthly interest income to be inappropriate under the circumstances, and we decline to apply Wife's suggested method of calculation.

prejudice from this classification. Pursuant to Rule 84.14, we amend the judgment to reflect that any applicable capital gains tax liability applies only to tax liability resulting from the sale of 49% of EAH.

Thus, we affirm the judgment of the trial court, as amended by this opinion.

LISA WHITE HARDWICK and GARY D. WITT, Judges, concur.